

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-18-1996

# H. K. Porter Co., Inc. v. Pennsylvania Ins. Guar. Assn.

Precedential or Non-Precedential:

Docket 95-3182

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"H. K. Porter Co., Inc. v. Pennsylvania Ins. Guar. Assn." (1996). *1996 Decisions*. Paper 249.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/249

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-3182


H. K. PORTER COMPANY, INC., a Corporation
Appellant

v.

PENNSYLVANIA INSURANCE GUARANTY ASSOCIATION,
an unincorporated association


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 93-0212)


Argued October 30, 1995

BEFORE:  NYGAARD, ALITO and
SAROKIN, Circuit Judges


(Opinion filed January 18, 1996)

<div style="margin-left:50%">

Frederick J. Francis (argued)
Meyer, Unkovic & Scott
1300 Oliver Building
Pittsburgh, PA  15222

Attorneys for Appellant

John W. Jordan IV (argued)
Gaca, Matis & Hamilton
300 Four PPG Place
Pittsburgh, PA  15222

Attorneys for Appellee

</div>

1

OPINION OF THE COURT


SAROKIN, <u>Circuit Judge</u>:


Plaintiff H.K. Porter Company, Inc. ("Porter") filed suit in federal district court against the Pennsylvania Insurance Guaranty Association ("PIGA") seeking a declaration that PIGA was legally obligated to indemnify Porter under the terms of three insurance policies issued to Porter by an insolvent insurance company. Porter claimed that each of the approximately 100,000 lawsuits filed against it constitutes a separate "covered claim" for which Porter is entitled to the statutory limit of $300,000 on each claim, subject to the $5 million coverage limit of each policy. The district court entered an order for partial summary judgment in favor of PIGA, holding that Porter was only entitled to indemnity for three covered claims -- one for each policy that Porter held with the insolvent insurance company -- on the theory that Porter, rather than those claiming against it, was the claimant. We disagree and reverse.


I.

Beginning in 1958, H.K. Porter was engaged in the manufacture and sale of various types of asbestos-containing products. These products were sold for use in shipyards and the ship-building industry across the country and around the world.


2

In 1984, Porter began to be inundated with lawsuits by individuals alleging bodily injury or death as a result of exposure to asbestos-containing products. By 1991 Porter was being sued at the rate of approximately 2,000 separate cases per month. The sheer volume of these lawsuits eventually forced Porter into Chapter 11 bankruptcy, by which time there had been approximately 100,000 lawsuits filed against Porter. Porter settled or disposed of many of these claims through payment of $30 million of its own funds. At the time of the bankruptcy, the estimated value of identified pending lawsuits against Porter was approximately $590 million.

During its operational years, Porter had maintained several different insurance policies, including three "commercial catastrophe liability" policies issued by Integrity Insurance Company. These policies had indemnity limits of $5 million per occurrence/$5 million annual aggregate, resulting in a total aggregate of $15 million under the three policies. All parties agree that the policies cover liability and indemnity for bodily injury arising from Porter's manufacture and sale of asbestos products.

When the flood of lawsuits began in the late 1980s, Porter sought indemnity from Integrity for all amounts which Porter had paid in the process of settling lawsuits or would become legally obligated to pay in the future. In March of 1987, however, Integrity Insurance Company was declared insolvent. Porter thus turned to PIGA for indemnity. PIGA is an unincorporated association created by statute for the purpose of providing means

3

for payment of covered claims when the insurance company responsible for those claims has become insolvent, and for the purpose of avoiding financial loss to claimants and policy holders. See 40 P.S. § 1701.102(1) (repealed 1994).[1]

PIGA persistently refused to indemnify, defend, or in any way become involved in Porter's asbestos lawsuits, despite Porter's continual requests starting in 1987. As a result, Porter filed suit against PIGA on February 12, 1993, seeking a declaration that PIGA could be required to pay Porter up to $15 million -- the $5 million aggregate limit for each of the three Integrity policies -- as well as counsel fees and expenses for the defense of the lawsuits.[2]

The parties filed cross motions for summary judgment. One of the issues presented in the motions was whether the $299,900 statutory limit[3] set forth in section 201 of the PIGA Act for each "covered claim" applied to three claims (one claim supposedly made by Porter under each Integrity policy), or

---

[1] The PIGA Act was repealed on December 12, 1994, see 1994, Dec. 12, P.L. 1005, No. 137, § 2, and replaced by the Pennsylvania Property and Casualty Insurance Guaranty Association Act, 40 P.S. § 991.1801 et seq. The PIGA Act, however, applies in the instant matter.

[2] Porter has already paid approximately $30 million to defend and settle lawsuits thus far, $18 million of which was for the cost of defense, and the remaining $12 million for the actual disposition and settlement of the claims. See H.K. Porter Company, Inc. v. Pennsylvania Insurance Guaranty Association, No. 93-212, typescript at 2 (W.D. Pa. Jan. 3, 1995); Appellant's Brief at 2. The issue of whether PIGA must indemnify Porter for the $18 million dollars it paid for the defense of lawsuits is before the district court and not at issue in this interlocutory appeal.

[3] The statutory limit is actually $300,000, subject to a $100 deductible. See 40 P.S. § 1701.201(b)(1)(i).

4

whether it applied to each separate, individual claimant lawsuit submitted by Porter to PIGA.  This section provides, in relevant part, as follows:

(1)  The association shall:

(i)  Be obligated to make payments to the extent of the covered claims of an insolvent insurer existing prior to the determination of said insurer's insolvency, and covered claims arising within thirty days after the determination of the insolvency, or before the policy expiration date if less than thirty days after such determination . . . but such obligation shall include only that amount of each covered claim which is in excess of one hundred dollars ($100), and is less than three hundred thousand dollars ($300,000).  In no event shall the association be obligated on a covered claim in an amount in excess of the obligation of the insolvent insurer under the policy under which the claim arises.

40 P.S. § 1701.201(b)(1)(i).

The district court held that the $299,900 statutory limit applied to each of the three claims it determined Porter had made (one under each of the Integrity policies), for a total maximum recovery of $899,700, far below Porter's $15 million indemnity claim against Integrity.  H.K. Porter Company, Inc. v. Pennsylvania Insurance Guaranty Association, No. 93-212, typescript at 11-12 (W.D. Pa. Jan. 3, 1995).

Porter filed a Motion for Reconsideration, but the district court denied the motion.  Porter then filed a motion requesting that the district court amend its Order regarding the statutory limit to acknowledge the existence of a controlling question of law as to which there is substantial ground for difference of opinion, which was granted.  Subsequently, Porter filed a Petition for Permission to Appeal from an Interlocutory Order,

5

pursuant to 28 U.S.C. § 1292(b). This court granted Porter's Petition, and we now decide this appeal.

II.

The district court had jurisdiction over the instant action under 28 U.S.C. § 1334(b), which provides federal district courts with original and exclusive jurisdiction over all cases under Title 11 of the United States Code. This court has jurisdiction pursuant to 28 U.S.C. § 1292(b). Our review of a grant or denial of summary judgment by the district court is plenary. See Rappa v. New Castle County, 18 F.3d 1043, 1050 (3d Cir. 1994).

III.

In November of 1970, Pennsylvania adopted the Pennsylvania Insurance Guaranty Association Act in order to provide insurance policy holders with a means to receive payment of claims covered against insolvent insurance companies. 40 P.S. § 1701.102(1). The Act and the statutory creation of PIGA were based on a model bill created by the National Association of Insurance Commissioners in response to the social harm that results from insurance companies becoming insolvent. See Sands v. Pennsylvania Insurance Guaranty Ass'n, 423 A.2d 1224, 1225-26 (Pa. Super. Ct. 1980).

> One of the stated purposes of Pennsylvania's Act is:
> (1) To provide a means for the payment of covered
> claims under certain property and casualty insurance
> policies, to avoid excessive delay in payment of such
> claims, and to avoid financial loss to claimants or

policyholders as a result of the insolvency of an insurer.

40 P.S. § 1701.102(1).

Under section 201 of the Act, PIGA is obligated to make payments for each "covered claim" against the insolvent insurance company, subject to a $299,900 statutory limit per "covered claim." 40 P.S. § 1701.201(b)(1)(i). In no instance is PIGA obligated to pay a covered claim in excess of the maximum amount the insolvent insurance company would have paid under the terms of the policy. Id.

The resolution of this case rests on the determination of what, exactly, constitutes a "covered claim." The Act defines it as follows:

> **"Covered claim"** means an unpaid claim, including a claim for unearned premiums, which arises under a property and casualty insurance policy of an insolvent insurer and is:
>
>> (i) The claim of a person who at the time of the insured event resulting in loss or liability was a resident of this Commonwealth, or
>>
>> (ii) A claim arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth.

40 P.S. § 1701.103(5)(a).

The district court concluded that the "covered claims" for which Porter was entitled to indemnity from PIGA included only one claim under each Integrity policy, for a total of three claims. H.K. Porter v. PIGA, No. 93-212, typescript at 11-12. The district court's rationale focused upon the word "person" in the phrase of the statutory definition of "covered claim" which reads: "'Covered claim' means . . . [t]he claim of a person who

7

at the time of the insured event resulting in loss or liability was a resident of this Commonwealth."  40 P.S. §1701.103(5)(a)(i) (emphasis added).  The district court noted that under the statute "person" is defined as "an individual, a corporation, a partnership, an association, or any other holder of or claimant under a property and casualty insurance policy." H.K. Porter v. PIGA, No. 93-212, typescript at 11 (citing 40 P.S. § 1703.103(8)).  The court thus concluded that by "[a]pplying that language to the claims of Porter, it is clear that the claims at issue are the claims of a person (Porter) for indemnification under the three Integrity policies," H.K. Porter v. PIGA, No. 93-212, typescript at 11, and therefore Porter is limited to indemnification for only $899,700, or $299,900 for each of the three Integrity policies.

Upon Porter's Motion for Reconsideration of this determination, the Court succinctly clarified its position as follows:

> This Court is aware that "person" is defined by statute as, among other things, a holder of or claimant under a property and casualty insurance policy.  However, that is not the issue.  The issue is who is the "person" making the claim in this case.  Clearly, the "person" making the claim in this case is Porter. . . .
>
> *       *       *
>
> [T]he clear language of the PIGA Act dictates that the covered claim is the claim of Porter for indemnification.  We find no support in either the statute or the case law of this jurisdiction for Porter's assertion that its claims somehow encompass the claims of the underlying asbestos claimants.  We believe that the reading of such a concept into the statute would violate the clear and express language of the Act.

8

<u>H.K. Porter v. PIGA</u>, No. 93-212, typescript at 4-5 (W.D. Pa. Feb. 9, 1995).

Porter submits that the "salient question is not whether Porter has 'covered claims' within the meaning of the PIGA Act, but <u>how many</u> covered claims Porter is able to assert." Appellant's Brief at 18 (emphasis in original). We agree.

The district court's analysis appears to rest on the faulty premise that if the insured submits numerous claims of others, such claims are to be treated as one covered claim per policy. Such a position, however, is untenable. As clearly illustrated by an analogy presented to the district court by Porter, there are circumstances in which one person is entitled to receive indemnity for more than one covered claim per policy:

> Let's suppose, Your Honor, that you, yourself, are insured with Acme Automobile Insurance Company and that, unfortunately, in one month you have two separate accidents, each magically causing a $300,000 damage to each victim in each accident. Two lawsuits arrive at your house on the same day. You tender them to your insurance company. But on the same day your insurance company goes insolvent. So you tender them to PIGA.

> *     *     *

> Now, let's suppose that . . . PIGA does not step up to the plate to defend Your Honor and to indemnify Your Honor. . . . Your Honor then is left at the plate. Your Honor will have to reach into your pockets to pay each $300,000 claim. Now Your Honor is out $600,000 and Your Honor files a lawsuit against PIGA. Under Your Honor's construction of the statute, you would only be entitled to $300,000. But aren't the two claims that Your Honor has presented to PIGA separate covered claims? If they are separate covered claims and if PIGA has to pay out $300,000 on each claim, it doesn't make sense to reward PIGA for refusing to pay each of those claims, wait for PIGA to be sued, and then for PIGA to assert in the lawsuit that Your Honor brought,

9

> ah ha, there is only one covered claim here because
> Your Honor is the "person" who's making the claim.

Appendix at 145–46. Unlike the district court, we find this analogy instructive and persuasive.

Accordingly, we reject the district court's conclusion that the PIGA Act only allows insureds to receive indemnity for one covered claim per policy. Rather, we conclude that the PIGA Act must be read to provide insureds with indemnity for each claim raised by underlying claimants. Each "covered claim" to which the $299,900 statutory cap applies is appropriately read to encompass the claims of the underlying tort victims, i.e. the underlying claimants. There are four bases upon which we reach our conclusion.

First, contrary to the district court's conclusion, the plain language of the PIGA Act militates that the "covered claims" to which the statutory cap applies include the claims of underlying claimants. Under the PIGA Act, a "covered claim" is "[t]he claim of a <u>person</u> who at the time of the insured event resulting in loss or liability was a resident" of Pennsylvania. 40 P.S. § 1701.103(5)(a)(i) (emphasis added).[4] A "person" is defined as "an individual, a corporation, a partnership, an association, or any other holder of <u>or claimant under</u> a property and casualty policy." 40 P.S. § 1701.103(8) (emphasis added). Therefore in Pennsylvania a "covered claim" for which PIGA must pay up to $300,000 is:

---

[4]There is an additional debate as to whether PIGA must pay the underlying claims of asbestos victims who are not residents of Pennsylvania. That issue is not before us on this appeal and we do not address it here.

10

> The claim of a [holder of <u>or claimant under</u> a property
> and casualty insurance policy] who at the time of the
> insured event resulting in loss or liability was a
> resident of [Pennsylvania].

40 P.S. § 1701.103(5)(a)(i) (emphasis added).

Second, as stated above, the intent of the Pennsylvania legislature in passing the PIGA Act was to "provide a means for payment of covered claims . . . , to avoid excessive delays in payment of such claims, and to avoid financial loss to policyholders as a result of the insolvency of an insurer." 40 P.S. § 1701.102(1). While we recognize that the Pennsylvania legislature did not intend for all insureds in all cases to be placed in the same position they would have been if their insurer had not become insolvent, see <u>Blackwell v. Pennsylvania Insurance Guaranty Ass'n</u>, 567 A.2d 1103, 1106 (Pa. Super. Ct. 1989), the result that the district court's decision would bring, whereby Porter could only recover $899,700 -- a mere 6% of the $15 million Porter would have been able to obtain from Integrity --is inconsistent with the stated policy goals of the legislation.

Third, it is only logical that the covered claims for which Porter seeks indemnity be viewed as comprised of the individual claims of the underlying tort victims. When multiple persons have been injured in an accident, each injured person has a separate covered claim even if their individual claims are asserted by the insured -- in this case Porter -- rather than the individuals themselves. Indeed, under Pennsylvania's "direct action" statute, tort victims may sue an insurer directly if the

11

insured has gone bankrupt or become insolvent.[5]  Therefore,
provided the relevant residency requirements are met, it makes
logical sense that PIGA indemnify Porter for each claim of the
injured tort victims, given that these tort victims could have
instituted claims against Integrity themselves.

Finally, the district court's conclusion that PIGA need only
indemnify Porter once for each of the three policies would have
grave policy consequences if allowed to stand.  The district
court's conclusion would encourage PIGA or a carrier insuring
"covered claims" to limit its liability by wrongly refusing to
honor the individual injury claims presented by the insured. When
the insured filed suit to compel payment, the numerous claims of
those injured suddenly would be converted into a single claim by
the insured and be subject to the maximum limit.  As a result,

---

[5]This statute reads as follows:

> No policy of insurance against loss or damage resulting
> from accident to or injury suffered by an employee or
> other person and for which the person insured is liable
> . . . shall hereafter be issued or delivered in this
> State by any corporation, or other insurer, authorized
> to do business in this State, unless there shall be
> contained within such policy a provision that the
> insolvency or bankruptcy of the person insured shall
> not release the insurance carrier from payment of
> damages for injury sustained or loss occasioned during
> the life of such policy, and stating that in case
> execution against the insured is returned unsatisfied
> in an action brought by the injured person, or his or
> her personal representative in case death results from
> the accident, because of such insolvency or bankruptcy,
> then an action may be maintained by the injured person,
> or his or her personal representative, against such
> corporation, under the terms of the policy, for the
> amount of the judgment in the said action, not
> exceeding the amount of the policy.

40 P.S. § 117.

insureds would receive virtually no coverage for their claims and, even if the victims were ultimately able to obtain coverage through the direct action statute, extensive delays and litigation would result.

Our conclusion that the "covered claims" at issue encompass the claims of the underlying tort victims finds further support from several cases which present a similar issue and which interpret insurance statutes from other states that, like Pennsylvania's Act, are based upon the model bill.

### A.

The case which most closely parallels this action is the Connecticut Supreme Court case, <u>Connecticut Insurance Guaranty Association v. Union Carbide Corp.</u>, 585 A.2d 1216 (Conn. 1991). <u>Union Carbide</u> grew out of the 1984 chemical disaster in Bhopal, India, which resulted in the deaths of 2,300 people and injuries to more than 200,000 others. <u>Id.</u> at 1219. Union Carbide brought a declaratory judgment action against the Connecticut Insurance Guaranty Association (CIGA) to resolve numerous issues relating to CIGA's obligation to reimburse Union Carbide for claims arising out of the disaster. Union Carbide had reached a settlement agreement with the Indian government and had then approached its insurance companies for reimbursement. The insurance companies had become insolvent, and Union Carbide thus approached CIGA for indemnity. <u>Id.</u>

One of the primary claims raised in <u>Union Carbide</u> was whether a "covered claim" referred to the claim of each victim who filed an action against Union Carbide or whether Union

13

Carbide presented only one covered claim which was subject to the $300,000 limit. Just as PIGA argues in the instant action, CIGA argued that the only covered claims were Union Carbide's six claims, each under one of six insurance policies issued by the insolvent insurers, limiting Union Carbide to a maximum recovery of $1,800,000. Id. at 1220.

The Connecticut Supreme Court disagreed and held that CIGA was required to pay the claims presented up to the total limits of the underlying policies. The Supreme Court based its conclusion on several grounds, each of which is equally applicable in the instant case.

First, the Connecticut Supreme Court concluded that, under the Connecticut statute, the Bhopal victims could sue Union Carbide's insolvent insurance companies directly under a Connecticut statute. Id. This direct action statute allows a tort victim to file an action directly against an insurer if the victim has obtained a judgment against an insured that remains unsatisfied for thirty days. Id.; see also C.G.S.A. § 38-175. Thus, sheer logic dictated that CIGA be held liable for the claims of the individual tort victims. As explained above, Pennsylvania also has a "direct action" statute allowing tort victims to sue an insurer directly if the insured has become bankrupt or insolvent. 40. P.S. § 117. Therefore, the Connecticut Supreme Court's reasoning applies to the instant action.

Second, the Connecticut Supreme Court rejected CIGA's argument that the definition of "covered claim" only encompassed

14

the claim of the insured Union Carbide, rather than the claims of the underlying tort victims.  <u>Union Carbide</u>, 585 A.2d at 1221. The Court recognized that under the statute a "covered claim" encompasses the claims of "<u>the claimant</u> or insured." C.G.S.A. §38-275(4) (emphasis added).  The Court thus concluded that under this language either the insured resident of Connecticut or the underlying claimant, in that case the Bhopal victims, might present a "covered claim" to CIGA.  <u>Id.</u>

While the language in Pennsylvania's statute is not identical to that in Connecticut's statute,[6] it, too, suggests the same conclusion.  As explained above, when the definition of "person" from 40 P.S. § 1701.103(8) is inserted in the definition of "covered claim" the resulting definition makes clear that the Connecticut Supreme Court's conclusion that a "covered claim" may be presented by either the insured or a claimant is equally true in Pennsylvania:

> The claim of a [holder of or <u>claimant</u> under a property and casualty insurance policy] who at the time of the insured event resulting in loss or liability was a resident of [Pennsylvania].

---

[6]We recognize that the definition of a "covered claim" in the Connecticut statute at issue in <u>Union Carbide</u> differs in some respects from the definition in the Pennsylvania statute at issue here.  For example, under the Connecticut statute, a claim against a Connecticut resident insured could qualify as "covered" even if asserted by a non-resident based on an event occurring outside of the state of Connecticut.  <u>See</u> <u>Union Carbide</u>, 585 A.2d at 1220. Under the Pennsylvania statute, by contrast, a claim can qualify as "covered" only if it is either "(i) The claim of a person who at the time of the insured event resulting in loss or liability was a resident of this Commonwealth, or (ii) A claim arising from an insured event resulting in loss or liability to property which was permanently situated in this Commonwealth." 46 P.S. §1701.103(5)(a).  This difference, however, is not significant for present purposes.

15

40 P.S. § 1701.103(5)(a)(i) (emphasis added).

Third, the Connecticut Supreme Court ruled as it did because it concluded that such a ruling was consistent with the intent of the legislature:

> Apart from our conclusion that the text of the act does not support the imposition of a $300,000 limit upon [Union Carbide's] claim for indemnification under each of the six policies whose insurers have become insolvent, we are also persuaded that the remedial purpose of this legislation would be largely defeated by such a restriction. Although this case involves a substantial indemnification claim of $32,500,000 presented by a large corporate enterprise, it is not exceptional today for individuals to carry liability insurance with limits far in excess of $300,000. The recovery of $300,000 by a single victim of an automobile accident is not extraordinary, and when there are multiple victims the total liability of the insured can readily exceed that amount. If we were to accept CIGA's argument that only an insured may present a covered claim and that such a claim for indemnification from a single occurrence is limited to $300,000, the protection of Connecticut residents against losses resulting from insolvency of insurance carriers, which the legislature intended to provide, would often prove illusory.

Union Carbide, 585 A.2d at 1222–23. There can be no doubt that this same rationale applies in the context of Pennsylvania. As mentioned above, Connecticut's Insurance Guaranty Act is based upon the same model bill as the Act in Pennsylvania, and the purpose of Pennsylvania's Act is to "provide a means for the payment of covered claims . . . and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 1201.102(1).

A case recently decided by this court involving a similar issue suggests that the reasoning in Union Carbide may be

16

appropriately adopted by this court. In <u>T & N v. Pennsylvania Ins. Guaranty Ass'n</u>, 44 F.3d 174 (3d Cir. 1994), we were presented with the question of whether an insured company who had entered into one settlement agreement for all underlying claims with its now-insolvent insurer and sought recovery from PIGA, presented one covered claim for recovery or multiple covered claims. T & N argued that under the reasoning of <u>Union Carbide</u> it presented separate covered claims for each of the underlying claimants. We considered <u>Union Carbide</u> and determined that the facts of <u>Union Carbide</u> were different from T & N's scenario:

> Union Carbide settled with the underlying claimants. <u>The settlement agreement can thus be viewed as the embodiment of each claim which was filed against Union Carbide.</u> However, in the present case, T & N settled with the insurance company. The settlement agreement is not the embodiment of claims filed by the underlying claimants . . . . Payment was not related to the individual claims which had been filed. As a result, we find that <u>in light of the fact that T & N had entered into a single settlement agreement with [its insurer]</u> which encompassed all of its claims against the insurance company, it only has one covered claim which is subject to the $300,000 statutory limit.

<u>Id.</u> at 184 (emphasis added). We did not discredit <u>Union Carbide</u>'s reasoning in any way. To the contrary, this court's language in <u>T & N</u> indicates that, had T & N entered into a settlement agreement with the underlying claimants rather than the insurance company, we would have followed <u>Union Carbide</u>'s lead.

The facts in this case are very similar to those in <u>Union Carbide</u>. Porter has entered into settlement agreements with underlying claimants, and those settlements "can thus be viewed

17

as the embodiment of each claim which was filed," id., against Porter.

B.

Our construction of the statute is supported by cases from other jurisdictions as well. These cases all grow out of insurance disputes involving state Guaranty Agencies and statutes that are based on the model bill, and their reasoning is very much applicable to the instant case. See, e.g., Plymouth Rubber Co. v. Massachusetts Insurers Insolvency Fund, No. 87-440, slip op. (Mass. Super. Ct. May 24, 1988); Commercial Union Insurance Company v. Sepco Corp. 1989 U.S. Dist. LEXIS 18378 (S.D. Alab. 1989), aff'd, 918 F.2d 920 (11th Cir. 1990); Oglesby v. Liberty Mutual Insurance Company, 832 P.2d 834 (Okla. 1992).

For example, in Plymouth Rubber Co., the Massachusetts Superior Court held that each underlying claim raised against Plymouth Rubber Company, for which Plymouth Rubber sought indemnification from Massachusetts's Guaranty Fund, was a covered claim separately subject to the statutory $300,000 limit. Plymouth Rubber Co., No. 87-440, slip op. at 5. The court explained as follows:

> Under the Ideal Mutual insurance policy . . . the covered claims which arose out of the policy were the obligations to "indemnify the insured for all sums which the insured shall become legally liable to pay as damages arising out of claims made" against the insured in excess of the policy's $250,000.00 aggregate annual deductible. According to this language in the policy, Ideal Mutual was obligated to indemnify the plaintiff for all customer claims. . . . As such, every demand for indemnification was a covered claim.

18

<u>Id.</u>  The language of the insuring obligations in the policies

issued by Integrity to Porter is substantially similar to the

above quoted language in Plymouth Rubber's policy:

> . . . [Integrity Insurance] Company hereby agrees . . .
> to pay all sums, as more fully defined by the term
> ultimate net loss, for which the insured shall become
> obligated to pay by reason of liability
>> (a) imposed upon the insured by law or
>> (b) assumed under contract or agreement by
>> the insured
> arising out of personal injury, property damage or
> advertising liability caused by an occurrence.

App. at 29.  Therefore, the reasoning of <u>Plymouth Rubber</u> applies

in the instant case as well.

Guidance in this area is also offered by <u>Sepco Corp.</u>  There

the district court analyzed the purpose of the Alabama Insurance

Guaranty Association Act, which is substantially the same as

Pennsylvania's Act, and it concluded that the Alabama Insurance

Guaranty Association (AIGA) was responsible for paying each of

the underlying 2,000 claims made against Sepco by persons

claiming bodily injury from exposure to Sepco's asbestos-

containing products:

> AIGA argues there is one aggregate claim, limiting
> AIGA's liability to $149,900.00.  This argument is
> without merit.  Each of the over 2,000 underlying cases
> produces a separate claim.  To accept this <u>specious</u>
> argument would defeat the intent of the liability
> policy which [the insolvent insurer] issued Sepco and
> would leave Sepco substantially without insurance for
> the year's time during which [the insolvent insurer]
> supposedly covered its liability. . . . This
> interpretation would defeat the intent of the Alabama
> Legislature when it enacted "The Act" to protect the
> public against insolvency of insurance carriers.

<u>Sepco Corp.</u>, 1989 U.S. Dist. LEXIS 18378 at *13 (footnote

omitted) (emphasis added).  When the Eleventh Circuit reviewed

19

and affirmed this case on appeal, it declined to even address this specific claim by AIGA, noting it was "without merit and warrant[s] no discussion." Sepco Corp., 918 F.2d at 923 n.3.

Finally, Porter's position is supported by the Oklahoma Supreme Court's decision in Oglesby v. Liberty Mutual. There, the Oklahoma Supreme Court held that the wife and two minor children of a man killed in an industrial accident each presented their own separate covered claim for which they were entitled to Oklahoma's $150,000 statutory cap of recovery from the Oklahoma Guaranty Association. The Court noted that the portion of Oklahoma's statute in which the obligations of the Oklahoma Guaranty Association are laid out requires that "such obligations shall include the amount of each covered claim which is less than One Hundred Fifty Thousand Dollars ($150,000.00) . . . ." 36 Okla. Stat. § 2007 (emphasis added). The Court explained, "[t]he Legislature's use of the word 'each' rather than 'all' covered claims indicates that it anticipated the possibility of multiple recoveries." Oglesby, 832 P.2d at 840. The same logic applies in the context of Pennsylvania where the statute explains that PIGA's "obligation shall include only that amount of each covered claim which is in excess of one hundred dollars ($100), and is less than three hundred thousand dollars ($300,000)." 40 P.S. §1701.201(b)(1)(i) (emphasis added).

We find that the rationale applied by these other courts is equally applicable to the facts of the instant case. We find it all the more persuasive and compelling because PIGA has not

20

pointed to <u>any</u> case in any other court, nor have we found any, in which this issue was decided differently.

IV.

We now briefly address PIGA's argument that Porter is only entitled to recover $299,900 for each of its three Integrity policies because the policies cover liability per "occurrence," and injuries caused by the ongoing manufacture and sale of asbestos are all deemed to be part of the same "occurrence."

PIGA asserts that when two Pennsylvania superior court cases, <u>Vickodil v. Pennsylvania Insurance Guaranty Ass'n</u>, 514 A.2d 635 (Pa. Super. Ct. 1986), <u>allocatur denied</u>, 523 A.2d 346 (1987), and <u>Donegal Mutual Insurance Co. v. Long</u>, 564 A.2d 937 (1989), <u>aff'd</u>, 597 A.2d 1124 (1991), are read together a rule emerges requiring that in instances where an insurance policy has a "per occurrence" limit but has no "per person" limit, the statutory limit of $299,900 applies to and substitutes for the occurrence limit, thus entitling the insured to only one covered claim under the policy. We have reviewed both of these cases at length and conclude there is no merit to PIGA's argument whatsoever.

Furthermore, there is no support in the language of the Act itself that suggests that it is appropriate for PIGA to consider a "covered claim" to be all claims arising out of one occurrence. The language of the statute provides that PIGA's "obligation shall include only that amount of <u>each covered claim</u>" up to the

21

statutory limit.  40 P.S. § 1701.201(b)(1)(i).  The legislature used the phrase "each covered claim," not "each occurrence." This plain language in and of itself indicates that PIGA is obligated to pay up to the statutory cap on a per claim basis, not a per occurrence basis.  See, e.g., Ramage v. Alabama Insurance Guaranty Association, 919 F.2d 1010, 1012 (5th Cir. 1990) (holding that "the statutory language places a limit on the liability amount for a claim . . . but does not limit the number of claims which can be asserted from a particular occurrence"); Union Carbide, 585 A.2d at 1222 (holding that in context of Connecticut statute "[t]here is no basis for substituting the word 'occurrence' for the word 'claim'"); Florida Insurance Guaranty Association  v. Cole, 573 So.2d 868, 870 (Fla. Dist. Ct. App. 1990) (holding that each injured person is entitled to file a claim regardless of whether injuries arose from the same occurrence); Trans Louisiana Gas Company v. Louisiana Insurance Guaranty Association, 652 So.2d 686, 691 (La. Ct. App. 1st Cir. 1995) (holding that the claims of two injured children arising from one occurrence constituted two covered claims for which LIGA was responsible to the statutory limit).

V.

One might well argue that the Pennsylvania legislature never intended to compensate claims of this magnitude.  Mass tort claims may not have been considered or contemplated.  However, the statute makes clear that individual claims are subject to the statutory limitations and those limitations are not further

22

limited when asserted by the insured seeking indemnification for claims paid to or pending by others entitled to assert them.

Our interpretation carries out the legislative policy of protecting the insured and other claimants when an insurance carrier becomes insolvent and is unable to honor its commitments.

For the foregoing reasons, we hereby reverse the order of the district court granting partial summary judgment in favor of PIGA.