812 A.2d 566

**Shirley L. BELL and Thomas P. Bell, her husband, Appellants**

**v.**

**Joseph A. SLEZAK, M.D., Joseph A. Slezak, M.D. LTD, L. Alan Egleston, M.D., and Frick Community Health Center, Appellees.**

Supreme Court of Pennsylvania.

Argued March 5, 2002.

Decided Dec. 19, 2002.

Howard F. Messer, Pittsburgh, for appellants, Shirley L. and Thomas P. Bell.

Jon Robert Perry, Paul L. Hilko, Pittsburgh, for appellant amicus curiae, PA Trial Lawyers Ass'n.

Robert B. Hoffman, Harrisburg, for appellant amicus curiae, PA Medical Soc.

Andrew Frank Adomitis, Pittsburgh, for appellee, L. Alan Egleston, M.D.

William D. Phillips, Kathleen Smith Delach, Washington, for appellees, Slezak, et al.

Lise Luborsky, Philadelphia, for appellee amicus curiae, PA Property and Cas. Ins. Guar. Ass'n.

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION*

Chief Justice ZAPPALA.

This appeal presents multiple, foundational questions concerning the application of provisions of the Pennsylvania Property and Casualty Insurance Guaranty Association Act in a setting involving the insolvency of a former medical malpractice insurance carrier.

In late 1992, Appellants, Shirley L. and Thomas P. Bell, commenced a civil action asserting claims against Appellees, Joseph A. Slezak, M.D. and his professional corporation (collectively, "Dr. Slezak"), and others. The central averments of the complaint alleged medical malpractice on the part of Appellees during the course of Mrs. Bell's treatment for abdominal conditions. In settlement negotiations supervised by the common pleas court, the parties consummated an agreement pursuant to which the Bells would receive $500,000 in exchange for a joint tortfeasor release. Of this amount, $200,000 represented the limits of a policy of malpractice insurance which Dr. Slezak maintained with PIC Insurance Group ("PIC"), and $300,000 was to be the responsibility of the Pennsylvania Medical Professional Liability Catastrophe

Fund (the "CAT Fund").[1] Although PIC was not a party to the agreement, Dr. Slezak's agreement was made with the clear understanding that the policy limits would be furnished by the carrier. Prior to the disbursement of settlement funds, however, the Commonwealth Court issued an order placing PIC in liquidation in accordance with the liquidation provisions of the Insurance Department Act, 40 P.S. §§ 221.1–221.63. Such order triggered certain statutory obligations on the part of Pennsylvania Property and Casualty Insurance Guaranty Association ("PPCIGA" or "the Association"), pursuant to the Pennsylvania Property and Casualty Insurance Guaranty Association Act,[2] which are a primary subject of this appeal.

As a result of the insolvency, PIC failed to tender its portion of the settlement proceeds. Although PPCIGA's statutory obligations include payment of certain covered claims arising out of the insolvency of property and casualty insurers, *see* 40 P.S. § 991.1803(b)(1), it, too, refused to provide the $200,000; it claimed that under the non-duplication of recovery provision of the PPCIGA Act, 40 P.S. § 991.1817(a), which prescribes that "[a]ny amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance,"[3] it was entitled to offset medical expenses paid by

1.  In relation to the settlement, the CAT Fund served as a non-party statutory excess carrier pursuant to the Healthcare Services Malpractice Act, 40 P.S. §§ 1301.101–1301.1006 (superseded). *See* 40 P.S. § 1301.701(d) (superseded).

2.  Act of December 12, 1994, P.L. 1005, No. 137 § 1 (as amended, 40 P.S. §§ 991.1801–991.1820) (the "PPCIGA Act"). This legislation superseded the former Pennsylvania Insurance Guaranty Association Act, Act of Nov. 25, 1970, P.L. 716, No. 232 (as amended 40 P.S. §§ 1701.101–1701.605), which was the enabling legislation for PPCIGA's predecessor, the Pennsylvania Insurance Guaranty Association ("PIGA").

3.  The full text of the non-duplication of recovery provision is as follows:

    Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, worker's compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any

the Bells' health insurer, Capital Blue Cross and Blue Shield. Further, since such payments exceeded $200,000 and thus also the limits of the underlying PIC policy, PPCIGA took the position that any obligation on its part to make payment was extinguished.

The Bells filed a petition to enforce the settlement, seeking the $200,000 payment and contending that Dr. Slezak was responsible in the event that PPCIGA did not contribute the funds. Dr. Slezak opposed the petition, emphasizing PIC's contemplated role in terms of funding the settlement, which he contended was assumed by PPCIGA per its enabling statute. He contended that PPCIGA's entitlement to invoke the non-duplication of recovery provision in the present circumstances was an open issue pending before the Commonwealth Court, and that enforcement of the settlement agreement against him would be inequitable since, *inter alia*, he had tendered all required premiums to PIC and the CAT Fund and was an "innocent victim" of the circumstances resulting in PIC's liquidation.

In granting relief on the Bells' petition, the common pleas court noted, preliminarily, that PIC was neither a named party to the Bells' civil action nor referenced in the correspondence reflecting the parties' settlement. The court then applied conventional contract principles to conclude that the agreement was a valid one and remained fully enforceable after PIC's insolvency. Thus, although acknowledging the parties' awareness of PIC's involvement as Dr. Slezak's insurer, the common pleas court simply did not deem this awareness to be material to its disposition of the petition, particularly where the parties had not memorialized an intention that Dr. Slezak should be relieved of his obligation to present the settlement funds in the event that his insurer became insolvent. In effectively weighing the circumstances of the case in view of the express policy of the PPCIGA statute, the court explained as follows:

> amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.
> 40 P.S. § 991.1817(a).

The defense ... argues that the statute's purpose of avoiding financial loss to the policyholder as a result of the insolvency of an insurer would be frustrated if the statutory provisions did not apply to the settlement agreement. However, in a situation where either an innocent claimant or an innocent policyholder stands to suffer a financial loss as a result of the insolvency of an insurer, it is the policyholder that should bear the loss. The plaintiff had no relationship with the now insolvent insurer and had no reason in the preparation of the settlement agreement, to attempt to protect themselves from the insolvency of the insurer. The result referred to must occur in order to protect at least one member of the protected class (claimants and policyholders) from suffering any financial loss. In this way the public policy expressed in the statute of attempting to protect claimants from financial loss as a result of the insolvency of an insurer will be carried out.

Trial court opinion at 12–13. Additionally, since the Bells were non-parties with respect to the contractual relationship between Dr. Slezak and PIC, the common pleas court expressed doubt as to whether the Bells were "claimants" for purposes of PPCIGA, such that the non-duplication of recovery provision was even implicated by virtue of their health insurance recovery. *See* 40 P.S. § 991.1817(a).

On Dr. Slezak's appeal, an *en banc* Superior Court considered the matter in conjunction with two other cases involving overlapping issues, *Panea v. Isdaner,* No. 3677 Phila. 1998, and *Baker v. Myers,* No. 642 E.D. 1999, and reversed. *See Panea v. Isdaner,* 773 A.2d 782 (Pa.Super.2001). Rejecting the common pleas court's (and the Bells') reliance on ordinary contract principles as controlling, the majority indicated that such approach "ignore[s] the economic realities of litigation and the interplay of insurance coverage in the settlement process." *See id.* at 789. In this regard, the majority focused on the position of defendant-physicians vis-à-vis the insolvent malpractice insurance carrier, explaining:

No one disputes the fact that the settlement agreements established the defendants' liability; however, to the extent

the defendants' liability is covered by insurance the insurer is ultimately obligated to pay. It cannot logically be denied that all the parties anticipated that insurance would cover payment of the settlement amounts. The defendants all paid premiums for their malpractice insurance and expected to have coverage in the event of a claim. Thus, the defendant doctors are also victims of the insurers' insolvency. In recognition of the harm occasioned by insurance companies becoming insolvent the legislature saw fit to fashion a remedy by enacting this [PPCIGA] Act.

*Panea,* 773 A.2d at 789. In assessing the available remedy, the Superior Court majority accepted that, although they were not parties in relation to Dr. Slezak's insurance contract with PIC, the Bells nevertheless maintained a "covered claim" for purposes of the non-duplication of recovery provision. *See id.* at 789–90. Further, the majority adopted Dr. Slezak's characterization of himself as a victim of PIC's insolvency and therefore believed that, as a policy matter, he should benefit from the protective umbrella of the non-duplication of recovery provision, along with PPCIGA. *See id.* at 789 (indicating that "defendants are merely asserting a statutory right to either limit or extinguish their obligations to pay on the claims"). The majority thus referred to the Bells' right to payment under the settlement agreement as "nothing more than a claim against an insolvent insurer by virtue of having a claim against a tortfeasor who was insured by that insurer." *Id.* Furthermore, in these regards, the majority opined that the PPCIGA Act provides a clear and adequate remedy for a loss due to the insolvency of a property and casualty insurer, noting that statutory remedies are favored over common law ones. *See id.* at 789 (citing 1 Pa.C.S. § 1504). The Superior Court majority noted that the changed circumstances necessitating PPCIGA's involvement might provide a basis for rescinding the settlement, but emphasized that the parties had not chosen to pursue such course. *See id.* at 789 n. 3.[4]

4. In a concurring opinion, Judge Del Sole expressed his view that rescission is indeed a remedy available to a plaintiff faced with a reduction in payment following settlement on the basis of the non-

The majority then returned specifically to the question of whether, in light of the application of the non-duplication of recovery provision, the insured of the insolvent insurer may be held personally responsible for the amount of the offset, concluding that "the legislative intent of the Act precludes such an anomalous result." *Id.* at 791; *see also id.* at 792 ("To find the doctors personally liable for the offset amount would contravene one of the stated purposes of the Act, which is 'to avoid financial loss to ... policyholders as a result of the insolvency of an insurer.'") (quoting 40 P.S. § 991.1801(1)). The majority examined and rejected the Bells' argument (and the common pleas court's conclusion) that, as between an innocent injured and a tortfeasor, any loss should reside with the tortfeasor, concluding that there simply was no loss in the present circumstances, since, by definition, the non-duplication of recovery provision applies only in instances in which the claimant has already received a recovery. *See id.* at 791 ("In fact it is not the plaintiffs who bear the loss, rather, if any loss can be said to have occurred, it is the solvent insurers who paid plaintiffs' claims under the other source of insurance, which the Act requires to be exhausted first."). While the Superior Court majority recognized the need to consider the potential subrogation interest on the part of Capital Blue Cross and Blue Shield in this assessment, it reasoned that such interest was foreclosed as it was derivative of the Bells' and, under the majority holding, the Bells would not recover the medical expenses from Dr. Slezak. *See id.* at 791–92. Finally, the majority cited *Burke v. Valley Lines, Inc.*, 421 Pa.Super. 362, 617 A.2d 1335 (1992), in which the Superior Court previously had determined that the imposition of financial loss directly on the insured tortfeasor would contravene the purpose of PPCIGA's predecessor enactment. *See Panea,* 773 A.2d at 792.

In this appeal, the parties set forth the same arguments that were made before the Superior Court. Thus, we must determine the General Assembly's intent in promulgating the

duplication of recovery provision. *See Panea,* 773 A.2d at 797 (Del Sole, concurring).

various provisions of the PPCIGA Act to which the parties attribute disparate meanings. Since the facts are largely undisputed and the issues before us are primarily questions of law, our review is plenary. *Phillips v. A–Best Products,* 542 Pa. 124, 665 A.2d 1167, 1170 (1995).

As the Superior Court has explained, PPCIGA is a statutory unincorporated association vested with remedial obligations in circumstances in which licensed property and casualty insurers are deemed insolvent. *See* 40 P.S. §§ 991.1801 (describing PPCIGA's purposes as including "[provision of] a means for the payment of covered claims under certain property and casualty insurance policies, [avoidance of] excessive delay in the payment of such claims and [avoidance of] financial loss to claimants or policyholders as a result of the insolvency of an insurer"), *id.* at 991.1803. *See generally Sands v. PIGA,* 283 Pa.Super. 217, 221, 423 A.2d 1224, 1226 (1980) (discussing the PPCIGA Act's predecessor statute). PPCIGA obtains funding to satisfy claims obligations of insolvent insurers by collecting monies from all insurance companies that write property and casualty insurance in the Commonwealth. *See* 40 P.S. § 991.1803(b)(3), 991.1808. Under the circumstances arising from PIC's insolvency, PPCIGA would ordinarily assume payment of an insolvent insurer's obligations arising from claims made under the insurance policies of its insureds, *see* 40 P.S. § 991.1803(b)(1), subject to limitations embodied in the PPCIGA Act. *See, e.g.,* 40 P.S. § 991.1803(b)(1)(B) (establishing a $300,000 "per claimant" cap on PPCIGA's obligation to pay a covered claim). Under the Act, PPCIGA is also "deemed the insurer to the extent of the obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." *See* 40 P.S. § 991.1803(b)(2). *See generally Donegal Mut. Ins. Co. v. Long,* 528 Pa. 295, 300–01, 597 A.2d 1124, 1127 (1991); *Matusz v. Safeguard Mut. Ins. Co.,* 340 Pa.Super. 116, 118–19, 489 A.2d 868, 870 (1985). Accordingly, PPCIGA assumes certain legal defense obligations in connection with claims against insureds of insolvent insurers. *See* 40 P.S. § 991.1803(b)(1).

The PPCIGA Act and its predecessor were derived from a model, uniform law. *See Sands,* 283 Pa.Super. at 221, 423 A.2d at 1226. Significantly, particularly as applied in the areas of exhaustion and non-duplication of recovery, the model law frequently has been described as being plagued by multiple ambiguities and apparent inconsistencies. *See, e.g., New Hampshire Ins. Guar. Ass'n v. Pitco Frialator, Inc.,* 142 N.H. 573, 705 A.2d 1190, 1192–93 (1998).[5] For example, the non-duplication provision under review has been construed differently in many jurisdictions. *Compare, e.g., Pitco,* 705 A.2d at 1193 (concluding that both an insured and a third-party plaintiff are "claimants" for purposes of a non-duplication of recovery provision), *with Insurance Comm'r v. Property and Cas. Ins. Corp.,* 313 Md. 518, 546 A.2d 458, 463–64 (1988) (holding that only insureds are claimants). Its operation is obviously most straightforward in instances in which the claimant and the insured are the same person or entity, for example, where an insured driver has a claim against his insurer, which becomes insolvent. In such circumstances, the nonduplication provision will generally operate to restore the insured to the position he would have been in absent his insurer's insolvency, shifting any loss to solvent insurers. *See generally* Note, *Insurance Company Insolvencies and Insurance Guaranty Funds: A Look at the Nonduplication of Recovery Clause,* 74 Iowa L.Rev. 927 (May 1989). The application is somewhat more complex, however, where the asserted claimant and the policyholder are different persons (or entities) with potentially conflicting interests.

5. *See also Rhode Island Insurers' Insolvency Fund v. Benoit,* 723 A.2d 303, 307 (R.I.1999) ("we agree with the jurisdictions that have held that '[t]he language is ambiguous if not contradictory,' [and] that 'the interrelationship of the clauses and phrases is confusing' " (citations omitted)); *Cimini v. Nevada Ins. Guar. Ass'n,* 112 Nev. 442, 915 P.2d 279, 282 (1996) (describing a guaranty act exhaustion clause as "neither a model of clarity nor an exemplar of the draftsman's craft") (quoting *Arizona Property & Cas. Ins. Guaranty Fund v. Herder,* 156 Ariz. 203, 751 P.2d 519, 523 (1988)); *International Collection Serv. v. Vermont Property & Cas. Ins.,* 150 Vt. 630, 555 A.2d 978, 980 (1988); *Washington Ins. Guaranty Ass'n v. McKinstry Co.,* 56 Wash.App. 545, 784 P.2d 190, 194 (1990).

■ In considering such paradigms, we begin with a central aspect of the non-duplication of recovery provision, namely, the concept of a "covered claim." The PPCIGA Act defines a covered claim as, *inter alia:*

an unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article. . . .

40 P.S. § 991.1802(1).[6] In cases involving multiple tiers of potential claimants, controversy arises concerning which may be deemed to possess "covered claims." In the medical malpractice setting, therefore, a threshold issue is whether the term refers to the insured-physician's potential claim against PPCIGA pursuant to its policy with an insolvent malpractice carrier, or to a claim brought by the patient-plaintiff against the physician, such as the case here. Jurisdictions are divided concerning this question. *See supra.* Having surveyed the approaches, however, we are persuaded by the assessment of the New Hampshire Supreme Court in *Pitco,* 705 A.2d at 1190, in which the court determined that the term "covered claim" refers to both the first- and third-party claims. *See id.* at 1193. In so holding, the court cited to multiple instances in which the state guaranty enactment referred to "claimants or policyholders," and "the claimant or the insured" within operative provisions, thus suggesting that the terms were not intended by the legislature to be wholly coextensive. *See Pitco,* 705 A.2d at 1193 ("A construction of the statute that equated 'claimant' with 'insured' or 'policyholder' would contravene the fundamental principles that all of the words of a statute must be given effect and that the legislature is presumed not to have used superfluous or redundant words.").

■ The Pennsylvania statute not only mirrors New Hampshire's in its proximate, disjunctive references to policyholders and claimants, 40 P.S. § 991.1801(1) ("claimants or policyholders"), 991.1802 ("claimant or insured"), 991.1816 ("insured or

6. The term "claimant" is not specifically defined under the Act.

claimant"), but it also plainly contemplates that both first- and third-party claimants may possess covered claims. For example, the PPCIGA Act includes within the definition of "covered claim" claims for unearned premiums, *see* 40 P.S. § 991.1802, which obviously are reposited in insureds. Further, the statute expressly excludes from such definition "any first-party claim by an insured whose net worth exceeds [$25,000,000]," *id.*, thus suggesting, by negative implication, that insureds outside this category will at least in some circumstances have covered claims. The enactment also makes explicit reference to third-party claims, 40 P.S. § 991.1817, conveying the General Assembly's appreciation of the significance of the relevant distinction and the desirability of express differentiation between first- and third-party claims where differential treatment is intended. Of additional import, the cognizance of third-party claims is consistent with the broad definition of "covered claim" and the remedial purposes of the legislation. *See generally H.K. Porter Co. v. PIGA,* 75 F.3d 137, 141–42 (3d Cir.1996).[7]

Having determined that both first-party and third-party claimants may possess "covered claims" for purposes of the Act, we next consider the nature of PPCIGA's obligations in relation to the Bells' claim since it is their claim for funding of the settlement that is at issue here.

In this regard, initially, we note our agreement with the Superior Court that the Bells are not entitled to direct funding of the settlement from Dr. Slezak and that to so conclude "ignore[s] the economic realities of litigation and the interplay of insurance coverage in the settlement process." *Panea v. Isdaner,* 773 A.2d at 789. Additionally, as set forth earlier, the court aptly noted that "it cannot logically be denied that

7. Recently, in *Main Line Health, Inc. v. Pennsylvania Med. Prof'l Liab. Catastrophe Fund,* 738 A.2d 66 (Pa.Cmwlth.1999), *aff'd per curiam,* 566 Pa. 4, 777 A.2d 1048 (2001), the Commonwealth Court rejected the position that insureds of the insolvent insurer are claimants under the Act. *See id.* at 70; *see also Pennsylvania Osteopathic Med. Ass'n v. Foster,* 134 Pa.Cmwlth. 368, 381, 579 A.2d 989, 995–96 (1990). Nevertheless, this Court's *per curiam* affirmance of *Main Line* did not constitute approval of the Commonwealth Court's reasoning. *See Commonwealth v. Tilghman,* 543 Pa. 578, 589–90, 673 A.2d 898, 903–04 (1996).

all the parties anticipated that insurance would cover payment of the settlement amounts," and that "[i]n recognition of the harm occasioned by insurance companies becoming insolvent the legislature saw fit to fashion a remedy by enacting this [PPCIGA] Act." *Id.* Thus, in our view, the Bells' only source of funding for the settlement was by virtue of their third-party covered claim. Accordingly, we turn to the language of the Act regarding PPCIGA's obligation to pay "covered claims."

One of the specific purposes of the PPCIGA Act is to "provide a means for *the payment of covered claims* under certain property and casualty insurance policies...." 40 P.S. § 991.1801(1) (emphasis added). Additionally, one of the enumerated powers and duties of PPCIGA is "[t]o be obligated to pay covered claims existing prior [to] the determination of insolvency...." 40 P.S. § 991–1803(b)(1). Thus, once a party is found to possess a covered claim for purposes of the Act, such as the Bells, it is then the obligation and duty of PPCIGA to pay such claim unless the PPCIGA Act provides a basis for the Association not being obligated on such claim. Here, it is the non-duplication of recovery provision that PPCIGA claims provides such a basis.

We recognize that PPCIGA possesses all rights of the insolvent insurer as if that insurer had not become insolvent. 40 P.S. § 991.1803(b)(2). Moreover, we are aware that in Pennsylvania, a third party to an insurance contract possessing a claim against the insured has no general right of action against the insurer. *Folmar v. Shaffer,* 232 Pa.Super. 22, 24, 332 A.2d 821, 823 (1974) ("The law is settled that 'in the absence of a statute or a policy provision on which such right may be predicated, a person may not maintain a suit directly against the insurer to recover on a judgment rendered against the insured.'" (citations omitted)). Therefore, in ordinary circumstances, absent a statutory basis, an insurer would have no obligation to pay third-party claims as such. As noted, however, the PPCIGA Act specifically provides the statutory basis for third-party beneficiary claims such as the Bells as the Act specifically contemplates third-party beneficiaries as claimants thereunder.

■ Having concluded that the Bells possess a covered claim pursuant to the Act and that there is a statutory basis for PPCIGA's obligation on such claim, we now turn to the non-duplication of recovery provision of the Act to determine if PPCIGA may offset the claim. This provision states, in relevant part:

(a) Any person having a claim under an insurance policy shall be required to exhaust first his right under such policy. For purposes of this section, a claim under an insurance policy shall include a claim under any kind of insurance, whether it is a first-party or third-party claim, and shall include, without limitation, accident and health insurance, workers' compensation, Blue Cross and Blue Shield and all other coverages except for policies of an insolvent insurer. Any amount payable on a covered claim under this act shall be reduced by the amount of any recovery under other insurance.

40 P.S. § 991.1817(a).

Pursuant to this provision, PPCIGA is entitled to offset its obligation to pay the Bells' covered claim by "the amount of any recovery under other insurance," which the Bells received. Here, the Bells received payments in excess of $200,000 by their medical health insurer, Capital Blue Cross and Blue Shield. Thus, as the Bells received an amount greater than the limits of Dr. Slezak's insurance policy with PIC Insurance Group, which was $200,000, PPCIGA's obligation for payment on the Bells' covered claim was extinguished.

This result is consistent with the stated purpose of the Act, which is to avoid financial loss to claimants and policyholders as a result of the insolvency of an insurer. 40 P.S. § 991.1801(1). Moreover, as observed by the Superior Court, "if any loss can be said to have occurred, it is the solvent insurers who paid plaintiffs' claims under the other source of insurance, which the Act requires to be exhausted first." *Panea v. Isdaner,* 773 A.2d at 791. As the court correctly points out

The Act clearly attempts to protect both policyholders and those with claims against policyholders from the consequences of the insolvency of the insurer by establishing an association, the sole purpose of which is to compensate those who have claims which have not been paid because the insurance company is insolvent. The association is funded by assessing a fee against all member insurers, and every insurer is required to be a member as a condition of its authority to write property and casualty policies. 40 P.S. §§ 991.1803(a), (b)(3), and 991.1808. In this manner, the risk of loss due to the insolvency of any one insurer is spread out over all member insurance companies and their policyholders. *Id.* at § 991.1810. In effect, every time PPCIGA pays a claim, every member insurance company is paying part of the claim. The Act therefore seeks to lessen the financial burden on the insurance industry by preventing duplication of recovery.

*Id.* at 790.[8]

Thus, as the Bells' only source of funding for the settlement entered with Dr. Slezak is by way of the PPCIGA Act and, as PPCIGA's obligation in this regard was extinguished by application of the non-duplication of recovery provision found in the Act, we affirm the Superior Court's decision.

Justice EAKIN did not participate in the consideration or decision of this case.

Justice SAYLOR files a dissenting opinion in which Justice NIGRO joins.

**8.** As noted previously, the Superior Court considered the potential subrogation interest of the Bells' health insurance carrier Capital Blue Cross and Blue Shield in this regard and concluded that such interest was foreclosed as it was derivative of the Bells' interest. The court noted that a subrogee has no greater rights than those held by the subrogor, thus, the subrogee is limited to recovering in subrogation the amount received by the subrogor relative to the claim paid by the subrogee. *Panea v. Isdaner,* 773 A.2d at 791 (*citing Allstate Ins. Co. v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021, 1024 (1987)).

348

Justice SAYLOR, dissenting.

I agree with the majority that both first- and third-party claims fall within the PPCIGA Act's broad definition of "covered claim," and I fully support its reasoning in this respect. My position is opposite the majority's, however, as concerns the obligations of settling defendants in a tort action and PPCIGA's surrogate responsibilities in relation to such settlements. Centrally, I believe that, in furtherance of the aim of ameliorating hardship to claimants and policyholders attributable to insurer insolvencies, the statutory scheme devised by the General Assembly expressly requires PPCIGA to fund settlements of the kind presently before the Court, thus effectively restoring the parties to the tort litigation to the position that they would have occupied but for the insurer insolvency, while maintaining the integrity of (and preserving incentives to enter) settlements. My reasoning follows.

The outset of the majority's analysis announces that defendants who have chosen to settle tort claims and whose insurers have become insolvent will be effectively immunized from the contractual obligation to fund their settlement commitments. See Majority Opinion at 573. Presumably, it is also intended that the defendants should nonetheless enjoy the benefit of the under-funded settlement, namely, release from any underlying liability in tort. The majority does not ground such conclusions in any substantive provision of the PPCIGA Act, but rather, references as support only the enactment's guiding policy. Although I recognize that it is necessary to bear in mind the policies giving rise to legislation, I believe that it is equally essential for the judiciary to respect the manner by which the General Assembly has sought to effectuate its stated purposes by implementing the policies via application of the substantive terms of the statute. Courts should therefore take care to evaluate the mechanics of a statute before reaching broad conclusions concerning what must be done to implement the salient policy aims.[1] While I return to

1. In this regard, it should be recognized that remedial statutory schemes such as the PPCIGA Act are frequently tempered and nuanced

the policy perspective below, at this juncture I merely note that the majority's decision to reorder the relationship of the parties to the underlying tort litigation and settlement at the outset of its opinion has a profound effect on its analysis of the PPCIGA Act's provisions which ultimately follows.

The terms of the PPCIGA Act reflect an effort to create a statutory claims administration process to spread the loss attributable to insurer insolvency from claimants and policyholders to a broader segment of the public. *See, e.g.,* 40 P.S. §§ 991.1801–991.1820. Notably, the legislation contains no reference to, and no attempt to govern, the outcome of litigation among prospective claimants outside the administrative setting—in particular, it is solely in the context of the distinct, administrative claims process that the non-duplication of recovery provision at issue here has relevance on its terms. *See generally Panea v. Isdaner,* 773 A.2d 782, 798 (Pa.Super.2001) (Todd, J., dissenting) (observing, in response to the Superior Court majority's assertion that Dr. Slezak's opposition to payment was merely his assertion of a statutory right to extinguish his obligation on the claim, that such entitlement, where it may exist, is expressly vested in PPCIGA and not with a defendant-physician).

Although, as all Justices agree, both the Bells and Dr. Slezak were entitled to assert covered claims under the PPCIGA Act, it is important to also recognize that the Legislature substantially restricted PPCIGA's obligations in relation to covered claims of third parties such as the Bells, since PPCIGA possesses all rights of the insolvent insurer as if that insurer had not become insolvent. *See* 40 P.S. § 991.1803(b)(2). In Pennsylvania, a third party to an insurance contract possessing a claim against the insured has no general right of action against the insurer. *See, e.g., Folmar v. Shaffer,* 232 Pa.Super. 22, 24, 332 A.2d 821, 823 (1974) ("The law is settled that 'in absence of a statute or a policy provision on which such right may be predicated, a person may not maintain a suit directly against the insurer to recover on a judgment

as a result of legislative efforts to balance or accommodate competing policies and interests.

rendered against the insured.'" (citations omitted)).[2] There-
fore, in ordinary circumstances such as are presented here,
PPCIGA has no obligation to pay third-party claims as such.
*Cf. H.K. Porter Co. v. PIGA*, 75 F.3d 137, 142 & n. 5 (3d
Cir.1996) (recognizing obligations on PPCIGA's part to third-
party claimants pursuant to Pennsylvania's direct action stat-
ute, 40 P.S. § 117, in circumstances involving insolvency not
only of the insurer, but also of the insured).[3]  This defense,
however, is obviously not available to PPCIGA in relation to a
policyholder of the insolvent insured, who maintained a predi-
cate contractual (first-party) relationship.  Accordingly, in the
present case, it should be recognized that the covered claim of
Dr. Slezak is the only claim that PPCIGA has the obligation to
consider for payment.[4]

   This position comports with PPCIGA's statutory role in
filling (or ameliorating) the void created by a carrier's insol-
vency, accords with the character of the insolvent-insured's
liabilities, and alleviates many of the conceptual complexities
presented in this line of cases.  Since PPCIGA has identified

2.  The Bells do not contend that a statute or policy provision would have
    entitled them to assert a direct claim against PIC or PPCIGA; indeed,
    in their brief they emphasize that they made no such claim.

3.  The majority states that "the PPCIGA Act specifically provides the
    statutory basis for third-party beneficiary claims such as the Bells['] as
    the Act specifically contemplates third-party beneficiaries as claimants
    thereunder."  Majority Opinion at 573.  In this regard, however, the
    majority gives no account for Section 991.1803(b)(2), which by its
    terms functions, *inter alia*, as an express, statutory limitation on PPCI-
    GA's obligation to pay covered claims to the extent that the insolvent
    insurer would have possessed the right to deny payment.  *See* 40 P.S.
    § 991.1802(b)(2) (listing among the express powers of PPCIGA the
    ability to "be deemed the insurer to the extent of its obligation on the
    covered claims and, to such extent, [PPCIGA] shall have all rights,
    duties and obligations of the insolvent insurer as if that insurer had not
    become insolvent").

4.  In this regard, I would reject PPCIGA's argument that related first-
    and third-party claims necessarily constitute the same claim.  The
    statutory definition does not support such a conclusion, nor is it
    necessary to construe the enactment in such manner in light of the
    express statutory machinery which requires of PPCIGA only a single
    satisfaction with regard to any overlapping claims by making available
    to it all defenses to claims which were available to the insured.  *See* 40
    P.S. § 991.1803(b)(2).

no collateral source of recovery available to Dr. Slezak, the non-duplication of recovery provision simply is not implicated in relation to his covered claim as the insured. *Cf. DeVane v. Kennedy*, 205 W.Va. 519, 519 S.E.2d 622, 631 (1999) ("Whether there exists another policy of insurance does not matter unless it provides collateral coverage for the claim asserted against the insolvent insurer and, ultimately, against the [Insurance Guaranty Association]."). The statute, therefore, operates to afford Dr. Slezak (the policyholder and first-party claimant) the core protection that is central to its purposes, at the same time indirectly benefiting the Bells (third-party claimants who possessed no direct right of action against PIC) by providing the source of funding to effectuate their settlement. This also is in conformity with the express aims of the PPCIGA Act. *See* 40 P.S. § 991.1801(1) (identifying the avoidance of financial loss to "claimants or policyholders" as among the Act's salutary purposes). Since the settlement should thus be fully funded, it should be consummated in absence of some appropriate contest by PPCIGA, *see* 40 P.S. § 991.1803(b)(4), thereby alleviating the potential for rescission of compromises alluded to by members of the *en banc* Superior Court, *see Panea*, 773 A.2d at 789 n. 3; *id.* at 797 (Del Sole, C.J., concurring); *id.* at 801 (Todd, J., dissenting), and supporting the strong public policy of this Commonwealth favoring consensual settlements. *See Taylor v. Solberg*, 566 Pa. 150, 157–58, 778 A.2d 664, 667 (2001); *cf. DeVane*, 519 S.E.2d at 634 ("To rule as the [state guaranty association] suggests would completely obliterate and destroy the voluntary settlement agreement the parties reached prior to [a carrier's] insolvency[;][g]iven the high esteem and great preference accorded settlements generally, . . . we cannot in good conscience set aside the voluntary resolution of this matter").

Furthermore, this plain meaning interpretation advances the public policy in support of adequate compensation to injured parties. *See Bethea v. Forbes*, 519 Pa. 422, 426, 548 A.2d 1215, 1217 (1988).[5] The interpretation also avoids the

---

**5.** In this regard, the allusion of *amicus*, The Pennsylvania Medical Society, to a windfall on the part of the Bells is inapt. In the voluntary

inherent and unseemly conflict of interest that arises by virtue of PPCIGA's efforts to avoid its obligations to insured physicians such as Dr. Slezak based upon concerns regarding duplication of recovery that are remote to him, at the same time as the Association is endowed with the obligation to zealously defend the physician's interests. *See generally* J. Earnst Hartz, Jr., *State Insurance Guarantee Associations*, 22–FALL BRIEF 20, 45 (1992) (positing that "[t]he IGAs clearly have abandoned the mandate in the model acts and in the various IGA statutes to interpret the guaranty funds statute broadly to protect the insured").

Certainly, these advantages are counterbalanced by costs. I recognize that a determination that the non-duplication of recovery provision effectively does not operate in a vertical plane decreases the provision's potency in terms of constraining the breadth of PPCIGA's obligations.[6] Nevertheless, PPCIGA has not attempted to develop a record concerning

settlement of a claim, litigants and subrogees may accept a substantial reduction in due damages in exchange for expediency and certainty. It may, therefore, represent a substantial imposition for the litigant in such circumstances to be faced with an involuntary reduction in the proceeds of the compromise that was struck. *Cf. DeVane*, 519 S.E.2d at 634 ("in this world of uncertainties, ... we find it patently unfair to require [the plaintiff], who undoubtedly considered these and many other potential outcomes in making her decision to settle her lawsuit and release her claims against the defendants, to sacrifice the voluntary and final resolution of her litigation[;][w]e further find distasteful the [state guaranty association's] failure to account for this all-too-real potentiality given the Guarantee Act's explicit purpose of protecting claimants and policyholders of insolvent insurers."). Particularly as a plain interpretation of the statute does not impede remote subrogation interests, I would not attach the characterization of windfall to the mere preservation of the benefit of the plaintiffs' bargain.

6. I would reject, however, the suggestion of Dr. Slezak and PPCIGA, citing to *Burke v. Valley Lines, Inc.*, 421 Pa.Super. 362, 369, 617 A.2d 1335, 1338 (1992), that the provision is rendered meaningless by an interpretation that does not wholly insulate the insured from liability. The non-duplication of recovery provision plainly operates to relieve PPCIGA of responsibility for payment of claims possessed by those with a direct claim or right of action against the insolvent insured who also possess a collateral source of recovery; in this regard, the provision also serves the salutary purposes of the statute. Therefore, and in light of the General Assembly's decision to afford PPCIGA all defenses available to the insolvent insured in relation to covered claims, I do not find the arguments relative to *Burke* controlling.

the degree to which such a reading affects the fiscal soundness of the statutory scheme; moreover, the judicial process is ill suited to considerations of these kinds. *See infra.* On the record presented, and in view of the terms employed in crafting the PPCIGA Act, I cannot say that the Legislature did not intend to strike the particular balance between the burden befalling the pooled resources of property and casualty insurers and collateral source insurers that results from a plain reading of the statute.

The final consideration which causes me to reject the construction of the opinion favoring affirmance is that the majority is simply required to fill too many and too large gaps in the statute in order to solidify its envisioned framework, principally in terms of absolving the defendant-physicians from liability.[7] An alteration of substantive liabilities of such magnitude has substantial collateral effects throughout the judicial process, as the observations of the *en banc* Superior Court dissent and the common pleas court reflect, and is therefore the kind of substantive change better suited, at least in the first instance, to the consideration of the General Assembly. *See generally Pegram v. Herdrich,* 530 U.S. 211, 221, 120 S.Ct. 2143, 2150, 147 L.Ed.2d 164 (2000) ("complicated factfinding and such a debatable social judgment are not wisely required of courts unless for some reason resort cannot be had to the legislative process, with its preferable forum for comprehensive investigations and judgments of social value"); *Glenn Johnston Inc. v. Commonwealth, Dep't of Revenue,* 556 Pa. 22, 30, 726 A.2d 384, 388 (1999) (emphasizing that policy determinations are generally within the sphere of the Legislature); *Conner v. Quality Coach,* 561 Pa. 397, 417, 750 A.2d 823, 834 (2000) ("to the extent that litigants' substantive rights are to be substantially altered, modified, abridged or enlarged on the basis of public policy centered upon the protection of the public fisc through elimination of pass-through costs, such a rule, if appropriate, will have to originate in the legislative

7. Under the plain meaning interpretation, however, there is no cause to implement such a dramatic remedy as a stopgap measure, since relief from liability should occur in the ordinary course by virtue of the contractual release to be furnished by the Bells.

branch"). Moreover, this Court's prerogative is generally to abide by long-standing common law traditions in absence of express legislative action. *Accord Lonigro v. Lockett*, 253 Ill.App.3d 308, 192 Ill.Dec. 305, 625 N.E.2d 265, 269 (1993) (observing that "a defendant remains liable for any judgment against him despite the presence of the [state guaranty] [f]und").[8] *But see Proios v. Bokeir*, 72 Wash.App. 193, 863 P.2d 1363, 1365 (1993).

My primary difference with the majority is that I read the operative provisions of the PPCIGA Act as furthering the statute's salutary aims by creating an alternative source of funding to ameliorate the overall loss to claimants and policyholders occasioned by insolvencies of private insurers—the statute says nothing about extinguishing substantive law tort claims. *Accord Panea*, 773 A.2d at 797 (Todd, J., dissenting) (expressing the view, in line with the reasoning of the common pleas court, that the actual or effective molding of a verdict to reflect an offset on account of an insurer's insolvency constituted an improper interference with a lawfully rendered jury verdict). Facially, as noted, the PPCIGA Act administers third-party claims primarily by affording PPCIGA defenses that would have been available to the insolvent insurer, not by extension of the non-duplication of recovery provision to disturb consensual or adversarial resolution of controversies outside the scope of the statutory claims process. Moreover, the overall objectives of the statute (protection of the interests of both claimants and policyholders) are furthered by applying the express terms of the statute to require PPCIGA to fund settlements in the same manner as was expected of the insurer prior to its insolvency in circumstances in which the policyholder (who is the only party asserting a claim against PPCIGA) has no duplicate source of recovery.[9] Implementa-

8. Notably, the General Assembly has demonstrated that, when it intends to release an insured from liability, it knows how to do so expressly. *See, e.g.,* 40 P.S. § 221.40 (providing that the filing of a claim with the statutory liquidator by a third party "shall operate as a release of the insured's liability to the third party on that cause of action in the amount of the applicable policy limit").

9. I reiterate that the adjudicative (as opposed to legislative) process is ill suited to assessing the fiscal aspects of the equation, i.e., whether the

tion of the majority's paradigm gives rise to claims for rescission of settlements and substantially diminishes incentives on the part of plaintiffs to compromise their claims in instances in which the insurer insolvency pre-dates settlement by eliminating an essential source of funding.

Thus, I find insufficient justification for applying the non-duplication of recovery provision remotely to offset recovery by plaintiffs on tort claims (or related settlements) asserted under state law against the insureds of insolvent insurers. I acknowledge that PPCIGA's interpretation of its enabling statute is to be afforded substantial weight. Nevertheless, here I conclude that the controlling terms of the statute are adequately clear, and PPCIGA's course of action sufficiently far beyond the bounds of its mandate, to warrant the contrary interpretation.

Accordingly, I would hold that the PPCIGA Act neither bars the Bells' claims against Dr. Slezak nor forecloses his liability to them, and the non-duplication of recovery provision does not relieve PPCIGA of its payment obligation in relation to Dr. Slezak's covered claim. The effect of the statute, therefore, should be to place the Bells and Dr. Slezak in the positions that they would have occupied had PIC remained solvent.

Justice NIGRO joins this dissenting opinion.

———

initial design of the PPCIGA scheme can function as that system is put into practice in the present and future economic marketplace.