980 A.2d 588

**Joel S. ARIO, Acting Insurance Commissioner of the Commonwealth of Pennsylvania, Appellant**

v.

**RELIANCE INSURANCE COMPANY, Appellee.**

Supreme Court of Pennsylvania.

Argued March 3, 2009.

Decided Oct. 5, 2009.

492

Ann B. Laupheimer, Sheila Coombs Branyan, Stephanie C. Chomentowski, Blank Rome, L.L.P.; Eric Jonathan Rothschild, Deborah Fuchs Cohen, Pepper Hamilton, L.L.P., Philadelphia, for Joel S. Ario, Acting Ins. Com'r of the Com. of PA, appellant.

Gerald E. Arth, Beth Lisa Throne Fox Rothschild, Philadelphia, for Nat. Ass'n of Ins. Com'rs, appellant amicus curiae.

Deirdre M. Richards, Obermayer Rebmann Maxwell & Hippel, L.L.P.; Hillary C. Steinberg, James Michael Matour, Hangley Aronchick Segal & Pudlin, P.C.; Bruce R. Hoffman, Philadelphia, for Reliance Ins. Co., appellee.

Matthew Allender Williams, Steptoe & Johnson, PLLC; Bennett Evan Cooper, Pro Hac Vice, Phoenix, AZ, for Northland Ins. Co., appellee amicus curiae.

Mark Jason Dorval, David Carl Franceski, Stradley Ronon, Stevens & Young, L.L.P., Philadelphia, for Citicorp North America, Inc., intervenor.

Robert A. Kauffman, Michael L. Browne, Reed Smith, L.L.P.; Elizabeth C.F. Abrams, Philadelphia, for Vitas Healthcare Corp., intervenor.

Joseph James Bellew, Cozen O'Connor, Wilmington, DE, for Clients Assur. Pool, Ltd., intervenor.

494

Francis P. Newell, Philadelphia, for Celanese Americas Corp., intervenor.

Diane Marie Tokarsky, James William Kutz, Kimberly Colonna, McNees, Wallace & Nurick, LLC, Harrisburg, for Earth Tech., Inc., intervenor.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Justice GREENSPAN.

We evaluate Section 544 of the Insurance Department Act, 40 P.S. § 221.44 (the "Act") and determine what priority classification ought to be assigned to a subrogation claim held by an insurance company against an insolvent insurer under the Act. We hold that this type of claim is a loss claim for which the loss has been indemnified and therefore that the appropriate classification is set forth in subsection (g) of Section 533 of the Act. We therefore reverse the holding of the Commonwealth Court which improperly adopted a referee's determination that the appropriate classification was set forth in subsection (b).

## I. Facts

This case arises from a motor vehicle accident caused by an escaped horse. On January 9, 1998, the horse "Pocket Rocket" ran from the premises of the Sports Creek Raceway into automobile traffic and caused a motor vehicle accident in which Sheila Follen–Davis was injured. At the time of the accident, Pocket Rocket's owners, the Members of the Harness, were insured by Appellee Reliance Insurance Company ("Reliance"). At the time of the accident, Ms. Follen–Davis was insured by Farm Bureau Insurance ("Farm Bureau").

Following the accident, Farm Bureau settled with Ms. Follen–Davis and paid her seven thousand dollars ($7,000) for her injuries. Farm Bureau then sought to recover $7,000 from Reliance. On May 30, 2001 Reliance and the Members of the

Harness executed a settlement agreement pursuant to which they agreed to pay Farm Bureau $7,000.

Although a check was issued by Reliance, Farm Bureau allowed the check to become stale. When Farm Bureau finally presented the check to its bank, the check was dishonored due to the lapse of time. On October 3, 2001, Reliance was placed into liquidation and thereafter was unable to issue a new check to Farm Bureau.[1] Farm Bureau therefore never received the $7,000 payment from Reliance.

In an effort to seek reimbursement, Farm Bureau submitted Proof of Claim No. 1010161 for $7,000 in the Reliance liquidation (the "Claim").[2] Claim priority in the Reliance liquidation is governed by Section 544 of the Act, which sets forth the order of distribution of an insolvent insurer's assets. In its subsections, the Act classifies types of claims into different categories, each afforded more priority than the next. Claims classified under subsection (a) of Section 544, for example, have a higher priority than those classified under subsection (b). It is anticipated that Reliance will not have assets sufficient to pay all claims. As a result, claim priority is important to all claimants in the liquidation.

The parties agree that the Claim could only be classified under either subsection (b) or else the "catch all" subsection (g) of Section 544. 40 P.S. § 221.44(b), (g). Subsection (b) generally applies to "[a]ll claims under policies for losses wherever incurred, including third party claims, and all claims against the insurer for liability for bodily injury or for injury to or destruction of tangible property which are not under policies . . ." 40 P.S. § 221.44(b). There is a major "carve-out" in subsection (b), however. Pursuant to the language of subsection (b) "[t]hat portion of any loss, indemnification for which is provided by other benefits or advantages recovered

1. Appellant Joel S. Ario, the Acting Pennsylvania Insurance Commissioner (the "Commissioner"), acts as the liquidator for the Reliance liquidation. 40 P.S. § 221.15(a).

2. Hundreds of subrogation claims have been filed in the Reliance liquidation. Although the amount at stake in the instant matter is small, the resolution of this case will have a significant impact on numerous other, more substantial, subrogation claims.

by the claimant, shall not be included in this class ..." *Id.* To paraphrase the language of the Act, claims under policies for loss are categorized under subsection (b) unless the loss has been compensated by other benefits or advantages.

In the event that a loss has been compensated by other benefits or advantages, the claim would be classified under subsection (g) of the Act. 40 P.S. § 221.44(g). Pursuant to the language of subsection (g), classification under this section applies to "[c]laims or portions of claims, payment of which is provided by other benefits or advantages recovered by the claimant." 40 P.S. § 221.44(g)(3). To paraphrase the language of the Act, if a claim is subject to the carve-out described in subparagraph (b), then the claim is classified under subsection (g) of the Act, and that claim receives a lower priority in the liquidation.

Upon review of Farm Bureau's Proof of Claim, Appellant Commissioner designated the Claim as being classified under subsection (g). As the basis for this designation, the Commissioner reasoned that Farm Bureau's rights could be no greater than those of its insured, Ms. Follen–Davis, who was otherwise compensated. Farm Bureau filed an objection in the Commonwealth Court, arguing that the Claim should have been designated as one classified under subsection (b).

There are numerous claims in the Reliance liquidation. Some claims are subject to disputes regarding classification and priority. In an effort to resolve these disputes, the Commonwealth Court has appointed various referees to review claims and issue recommendations.

A subrogation claim by Empire Fire & Marine Insurance Company ("Empire") against Reliance was reviewed by Referee James C. Schwartzman. This claim arose from the fact that a Reliance insured caused a motor vehicle accident injuring Empire's insured David Wyrick. Empire paid Mr. Wyrick for his injures and then sought payment from Reliance. After reviewing the facts underlying the claim, Referee Schwartzman determined that Empire's subrogation claim should be classified under subsection (g). Referee Schwartzman's rec-

ommendation was affirmed by the Commonwealth Court on May 16, 2005.

A subrogation claim by Factory Mutual Insurance Company ("Factory") against Reliance was reviewed by Referee G. Alan Bailey. This claim arose from a fire in a building insured by Factory that was caused by a gasoline spill created by an employee of a Reliance insured. Factory paid its insured for the fire and then sought payment from Reliance. After reviewing the facts underlying the claim, Referee Bailey determined that Factory's subrogation claim should be classified under subsection (g). Referee Bailey's recommendation was affirmed by the Commonwealth Court on July 14, 2005.

Nearly a year after the resolution of the Empire and Factory claims, on February 25, 2006, the dispute regarding the instant Claim was referred to Referee Luther E. Milspaw. On May 3, 2006, Referee Milspaw issued a report and recommendation concluding that the Claim should be classified under subsection (b) (the "Report and Recommendation"). As the basis for his Report and Recommendation, Referee Milspaw found that Farm Bureau is a "claimant" under a policy for loss as defined by the Act in subsection (b). Referee Milspaw further reasoned that because Farm Bureau has no other source of reimbursement, the carve-out does not apply so the Claim must be classified under subsection (b), rather than subsection (g).

The Commissioner filed an exception to Referee Milspaw's Report and Recommendation in the Commonwealth Court. On December 14, 2007, the Commonwealth Court overruled the Commissioner's exception. *Ario v. Reliance Ins. Co.*, 939 A.2d 1004 (Pa.Commw.2007). The Commonwealth Court agreed with Referee Milspaw that the "claimant" was Farm Bureau, not Ms. Follen–Davis, who had been paid in full. *Id.* at 1006. Because Farm Bureau was the claimant and had not been otherwise compensated for its loss, the Commonwealth Court reasoned that the Claim fit squarely into subsection (b) of the Act. *Id.* at 1007–1008. The Commonwealth Court further reasoned that the language of subsection (g) referring to "other benefits or advantages" did not apply to a primary

insurance policy issued by Farm Bureau because this language applied to "excess coverage." *Id.* at 1007.

The Commissioner filed a Motion for Reconsideration. In support thereof, the Commissioner cited the referee determinations relating to the Empire and Factory subrogation claims. As the Commissioner noted, these claims had been classified under subsection (g) of the Act and therefore similar claims had been dissimilarly classified in the Reliance liquidation. The Commonwealth Court denied the Motion for Reconsideration and the Commissioner filed a timely appeal to this Court.

## II. Analysis

In his brief the Commissioner posits the following two issues for this Court's review:

> Did the lower court err when it affirmed the Report and Recommendation of Referee Milspaw who found that insurer Farm Bureau Insurance Company, having paid its insured a settlement payment for wrongs allegedly committed by Reliance's insured, as it was required to do under its policy with insured, was entitled to (b) priority (pursuant to 40 P.S. § 221.44(b)) for its subrogation claim against Reliance, where (1) Farm Bureau Insurance Company's claim is entirely derivative of the rights of its fully-compensated [insured]; (2) the statute explicitly carves out from priority (b) "[t]hat portion of any loss, indemnification for which is provided by other benefits or advantages recovered by the claimants . . . ;" and (3) where (b) priority is and should be reserved for claims under policies of insurance for loss. Did the lower court improperly fail to adhere to (1) the doctrine of *stare decisis;* (2) the rule of coordinate jurisdiction; (3) the law of the case doctrine; or (4) applicable principles of equity and fairness or administration and asset distribution among creditors of an insolvent insurer's estate, when, having Orders affirming two prior Referee decisions assigning priority (g) to indistinguishable insurer subrogation claims, it ordered the Farm Bureau Insurance Company subrogation claim a (b) priority.

These issues can be concisely restated as follows: first, did the Commonwealth Court err in affirming Referee Milspaw's determination that the Claim was classified under subsection (b); second, was the Commonwealth Court permitted to discount or depart from prior referee decisions that it had affirmed in the Reliance Liquidation. Although our resolution of the first issue disposes of the matter, we discuss both issues in an attempt to elucidate issues that may arise on an ongoing basis in the Reliance liquidation.

### A. Proper Classification of the Claim

 First, we evaluate whether the Commonwealth Court erred in affirming Referee Milspaw's determination that the Claim was properly classified under subsection (b) of the Act. The Commissioner and amicus Northland Insurance Company ("Northland") [3] characterize the Claim in divergent ways, and these characterizations would seemingly result in different classifications under the Act.

 The Commissioner argues that the Claim should be classified under subsection (g) and the Commonwealth Court erred in giving it subsection (b) classification.[4] According to the Commissioner, the statutory "claimant" is Ms. Follen–Davis, and Farm Bureau merely assumes her posture as her subrogee. The Commissioner argues that Ms. Follen–Davis had a claim under a policy for loss, but that the loss was compensated by Farm Bureau. The Commissioner therefore

3. Farm Bureau has not filed a brief in this appeal, apparently due to the small amount of money at stake. Instead, amicus Northland filed a brief in support of the Commonwealth Court's decision, and presented oral argument to this Court. Northland has a subrogation claim in another matter that has been stayed pending resolution of this matter. Northland believes that the outcome in this matter will provide important precedent for its own case.

4. Amicus the National Association of Insurance Commissioners (the "NAIC") filed a brief in support of the Commissioner's position. In its brief, the NAIC argues that revisions of the Model Act regarding priority classification in insurance liquidation proceedings make it clear that these statutes are designed to protect policyholders first, before subrogated insurers like Farm Bureau. Moreover, as the NAIC points out, this Court's decision will have nationwide ramifications in other liquidation proceedings.

concludes that the compensation of the loss pushes the Claim outside of subsection (b) and into subsection (g) classification pursuant to the carve-out. 40 P.S. § 221.44(b). The Commissioner emphasizes that a subrogee insurer can be entitled to no greater payment than its insured. Moreover, as the Commissioner argues, public policy supports this result because "[s]ubordinating claims as to which recovery has already been secured from another source that is contractually responsible for payment of claims encourages all claimants to seek recovery from other insurers where possible, conserving the insolvent insurer's assets for claimants who have nowhere else to turn." Appellant's Brief, 22.

Amicus Northland argues that the Claim was properly classified under subsection (b) and that the Commonwealth Court did not err. According to Northland, the statutory "claimant" is Farm Bureau pursuant to a settlement agreement with Reliance. Northland argues that Farm Bureau has no alternate source of compensation. Northland therefore concludes that the carve-out is inapplicable so subsection (b) classification is proper. Moreover, Northland argues that the General Assembly could have expressly excluded all subrogation claims from subsection (b), in the way these claims are excluded in later Model Act provisions, but the General Assembly chose not to do so. Accordingly, Northland argues that the legislature must have meant to include some subrogation claims within subsection (b) classification.

As is not atypical in the context of liquidation, it is anticipated that Reliance's assets will not be sufficient to fully pay all claims asserted in the liquidation. As a result, the classification of claims in this and other liquidations is a matter of great significance to claimants. The liquidator, here the Commissioner, is charged with properly classifying claims to ensure equitable distribution of assets. 40 P.S. § 221.36(b)(3). Recognizing the importance of classifying claims, the General Assembly enacted the Act to ensure that claimants entitled to more protection have prioritized claims. Section 544 of the Act states, in relevant part, that "[e]very claim in each class shall be paid in full or adequate funds retained for such

payment before the members of the next class receive any payment." 40 P.S. § 221.44. The plain language of the Act must therefore be the starting point for any classification of claims.

At issue in this matter is the language of Section 544, subsection (b) and subsection (g) of the Act. Pursuant to the language of subsection (b), the following claims are classified thereunder:

All claims under policies for losses wherever incurred, including third party claims, and all claims against the insurer for liability for bodily injury or for injury to or destruction of tangible property which are not under policies, shall have the next priority. All claims under life insurance and annuity policies, whether for death proceeds, annuity proceeds, or investment values shall be treated as loss claims. That portion of any loss, indemnification for which is provided by other benefits or advantages recovered by the claimant, shall not be included in this class, other than benefits or advantages recovered or recoverable in discharge of familial obligations of support or by way of succession at death or as proceeds of life insurance, or as gratuities. No payment made by an employer to his employe shall be treated as a gratuity.

40 P.S. § 221.44(b). Pursuant to the language of subsection (g), the following claims are classified thereunder: "[c]laims or portions of claims, payment of which is provided by other benefits or advantages recovered by the claimant." 40 P.S. § 221.44(g).

▮ Here, the Claim arises in a subrogation context. The equitable doctrine of subrogation places the subrogee in the precise position of the one whose rights are subrogated. *Wimer v. Pa. Emp. Benefit Trust Fund*, 595 Pa. 627, 939 A.2d 843, 853 (2007); *Chow v. Rosen*, 571 Pa. 369, 812 A.2d 587, 590 (2002); *Pennsylvania Mfrs.' Ass'n Ins. Co. v. Wolfe*, 534 Pa. 68, 626 A.2d 522, 525 (1993); *see also Paxton Nat'l Ins. Co. v. Brickajlik*, 513 Pa. 627, 522 A.2d 531, 532 (1987) ("Subrogation is the equity called into existence for the purpose of enabling a party secondarily liable, but who has paid the debt, to reap the

benefit of any securities which the creditor may hold against the principal debtor, and by the use of which the party paying may thus be made whole.")

 To determine whether the Commonwealth Court erred in assigning the priority of the Claim, we must engage in a statutory analysis of subsections (b) and (g) of Section 544 of the Act. The objective of interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S. § 1921(a). Generally, the best indication of legislative intent is the plain language of the statute. *Commonwealth v. Shiffler*, 583 Pa. 478, 879 A.2d 185, 189 (2005); *Allegheny County Sportsmen's League v. Rendell*, 580 Pa. 149, 860 A.2d 10, 15 (2004). It is well settled that when the words of a statute are clear and unambiguous, they are "not to be disregarded under the pretext of pursuing [the statute's] spirit." 1 Pa.C.S. § 1921(b). It is only when the words of the statute are not explicit that the court should seek to determine the General Assembly's intent through consideration of statutory construction factors. 1 Pa.C.S. § 1921(c).

The plain language of Section 544 demonstrates that a subrogated claim, like the Claim at issue in this matter, is subject to the carve-out in subsection (b) and therefore is properly classified under subsection (g). First, the plain language of subsection (b) states that "[a]ll *claims under policies for losses* wherever incurred, including third party claims" are entitled to priority under subsection (b). 40 P.S. § 221.44(b) (emphasis added). Therefore, in order to be classified under this subsection, a claim must be alleged under a *policy* for loss.

Second, even if a claim is alleged under a policy for loss, it may still be exempt pursuant to the carve-out in subsection (b). The plain language of subsection (b) states that a "portion of any loss, indemnification for which is *provided by other benefits or advantages recovered by the claimant, shall not be included in this class* ..." *Id.* (emphasis added). Therefore, where there has been compensation for loss, a claim may not properly be classified under subsection (b). In evaluating this

subsection of the Act, we note that the use of the word "shall" renders the carve-out mandatory. *See Koken v. Reliance Ins. Co.*, 586 Pa. 269, 893 A.2d 70, 81 (2006) (holding that the term "shall" is mandatory for purposes of statutory construction when the statute is unambiguous).

If a claim is subject to the carve-out in subsection (b), the plain language of the Act dictates that the claim be classified under subsection (g). Pursuant to its plain language, subsection (g) applies to "[c]laims or portions of claims, payment of which is provided by other benefits or advantages recovered by the claimant."

The language of the Act is clear. In order to be classified under subsection (b), a claim must: 1) derive from a policy covering loss; and 2) must not have been otherwise compensated. If neither is true, that claim is classified under subsection (g).

Applied to the facts of this matter the plain language of the Act directs the classification of the Claim under subsection (g).[5] Northland's argument to the contrary places it in a double bind. On one hand, Northland argues that the Claim arises not from subrogation directly, but from the settlement agreement between Farm Bureau and Reliance. If this is true, then the Claim fails to meet the first element, that a claim derive from a *policy* covering loss. There is no policy between Farm Bureau and Reliance. The only applicable policy is an insurance contract between Reliance and the Members of the Harness that applies to third parties injured by Pocket Rocket. Under the facts of the instant matter, that policy covers injury to Ms. Follen–Davis but not Farm Bureau. In order to avail itself of any coverage under the policy, Farm Bureau must stand in the shoes of its insured Ms. Follen–Davis. Without this subrogation context, there is no policy under which Farm Bureau can seek payment from Reliance. Moreover, Northland's interpretation of the Claim

5. Northland urges this Court to examine the legislative intent and history underpinning the Act. Such an examination is not necessary or appropriate where, as here, the Act's language is unambiguous and Northland's interpretation is contrary to the Act's plain language.

is faulty. Farm Bureau is not a "third party claimant" merely as a result of the settlement agreement. Farm Bureau would have no cause of action against Reliance without its insured, Ms. Follen–Davis. Farm Bureau's entire posture in the Reliance liquidation is vis-à-vis its relationship with its insured.

If, on the other hand, Northland acknowledges that the Claim arises from subrogation, then Farm Bureau "stands in the shoes" of Ms. Follen–Davis. *See Johnson v. Beane*, 541 Pa. 449, 664 A.2d 96, 100 (1995) (holding that an insurance company "stands in the shoes" of the insured when pursuing an action against the tortfeasor). The true statutory "claimant" is Ms. Follen–Davis. Even when Farm Bureau steps into her position pursuant to the rules of subrogation, Ms. Follen–Davis remains the true "claimant." Because she has already been compensated, the carve-out applies to the Claim. Ms. Follen–Davis—and thus Farm Bureau—is a "third party claimant" with a claim against Reliance for injuries committed by Reliance's insured. Were it not for the compensation by Farm Bureau, Ms. Follen–Davis could have asserted a claim subject to classification under subsection (b). But Ms. Follen–Davis had coverage through her own insurer, Farm Bureau, and was compensated. Farm Bureau cannot claim any higher status than Ms. Follen–Davis could have claimed herself, and payment to Ms. Follen–Davis triggers the application of the carve-out. Therefore, since Ms. Follen–Davis would not be entitled to priority under subsection (b), Farm Bureau cannot be entitled to such priority. Northland's argument, if accepted, would result in Farm Bureau having more rights than its insured. This result is contrary to the principles of subrogation and Pennsylvania Law. *See, e.g., Bell v. Slezak*, 571 Pa. 333, 812 A.2d 566, 574 (2002) ("a subrogee has no greater rights than those held by the subrogor").

## B. *Precedential Effect of Other Claim Classifications*

■ We now evaluate whether the Commonwealth Court was permitted to discount or depart from prior referee decisions that it had affirmed in the Reliance Liquidation. As the Commissioner points out, the Claim appears to have been

treated differently than other similar claims asserted in the Reliance liquidation. According to the Commissioner, *stare decisis*, the law of the case, and the doctrine of coordinate jurisdiction mandate that the decisions be reconciled, and that the aberrant decision regarding the Claim be reversed.

Northland attempts to distinguish the inconsistent claims, arguing that the settlement agreement creates a different set of circumstances. According to Northland, no prior decisions by referees or the Commonwealth Court are binding precedent on the Claim because the facts surrounding the Claim are distinguishable.

 Although there is no explicit rule governing referee decisions in liquidation matters, general principles of law support uniformity in these decisions. Pennsylvania law generally favors certainty and stability and these principles are embodied in various doctrines. Under the doctrine of *stare decisis*, a conclusion reached in one matter should be applied to future substantially similar matters. *See Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 954 (2006) ("The basic legal principle of stare decisis generally commands judicial respect for prior decisions of this Court and the legal rules contained in those decisions."). The law of the case doctrine sets forth various rules that embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter. *Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995). Pursuant to the coordinate jurisdiction doctrine, judges of equal jurisdiction sitting in the same case should not overrule each others' decisions. *Id.*

 We need not decide whether the particular doctrines cited above strictly apply in the context of referee recommendations in liquidation matters. It is clear that the broader principles of uniformity and equity apply and would direct the result here. In the context of a liquidation, where thousands of claims will be evaluated by various referees, there is value in an attempt to promote uniformity. Assuming for the sake

of argument that multiple claims in the same litigation involve similar facts, the same outcome should be ordered in each claim.

Here, for the reasons discussed at length above, the Claim is one against Reliance by a holder of a subrogation claim. The existence of a settlement agreement is immaterial, the Claim is not functionally different from the Empire and Factory subrogation claims. The Empire and Factory subrogation claims were assigned priority under subsection (g) of the Act. The facts surrounding the Claim do not justify a departure from the reasoning applied to the Empire and Factory subrogation claims. All claims in the Reliance litigation, including the Claim, ought to be treated uniformly, and therefore the Claim should have also been assigned priority (g).

## III. Conclusion

Accordingly, we hold that the Commonwealth Court erred in failing to classify the Claim under subsection (g) of the Act. We therefore reverse the Commonwealth Court's decision, remand, and direct the entry of an order classifying the Claim under subsection (g) of the Act.[6]

Justice EAKIN and BAER join the opinion.

Justice TODD and Justice McCAFFERY join Parts I and IIA of the opinion.

Chief Justice CASTILLE files a concurring opinion, which Justice TODD and Justice McCAFFERY join in part.

Justice SAYLOR files a concurring opinion, in which Chief Justice CASTILLE joins.

Chief Justice CASTILLE, Concurring.

I concur in the result. I join Mr. Justice Saylor's Concurring Opinion respecting the first issue presented. I write separately only to express my view of the jurisprudential

---

6. This Court commends all counsel who participated in this appeal for exceptionally well-crafted, well-researched, and persuasive briefs and arguments.

stability and uniformity concerns implicated in Part II.B of the Majority Opinion. *See* Majority Op. at 504–06, 980 A.2d at 596–97.[1]

The Commissioner argues that under either *stare decisis,* the law of the case doctrine, or the coordinate jurisdiction rule, the Commonwealth Court's disposition is erroneous because it does not conform to two of that court's 2005, single-judge adjudications in the *Empire* and *Factory Mutual* matters, even though those cases are materially indistinguishable on the claims classification issue presented. In those earlier matters, the court approved and affirmed referee recommendations that assigned the subrogated insurers' claims to "class (g)" priority status. The Majority recognizes the importance of the preclusion issue, but then determines that we "need not decide" whether the three preclusion doctrines cited by the Commissioner "strictly apply" in this context because, the Majority holds summarily, "[i]t is clear that the broader principles of uniformity and equity apply and would direct the result here." Majority Op. at 505, 980 A.2d at 597.[2]

I would meet the Commissioner's issue head-on because, if a preclusion doctrine applies, the Commonwealth Court has little or no discretion in a case such as this and it should be so informed. On the other hand, if a preclusion doctrine does not apply, we should offer a fuller explanation of the source and contours of the constraints we would impose on the doctrine. For the reasons that follow, I do not believe that the doctrines invoked by the Commissioner apply. Nevertheless, important jurisprudential concerns, arising from the nature of this sort of litigation, the need for stability and predictability, and the institutional relationship of the Commonwealth Court to this Court, counsel that the Commonwealth Court exercise more care in keeping its own house in jurisprudential order.

The core doctrine of *stare decisis* teaches that:

[F]or purposes of certainty and stability in the law, a conclusion reached in one case should be applied to those

1. Madame Justice Todd and Mr. Justice McCaffery join this concurrence on the point to which I write.

2. The Majority does not identify the broader principles to which it adverts, nor does it cite authority to support them.

which follow, if the facts are substantially the same, even though the parties may be different. While *stare decisis* serves invaluable and salutary principles, it is not an inexorable command to be followed blindly when such adherence leads to perpetuating error. *See* [*Mayle v. Pa. Dep't of Highways,* 479 Pa. 384, 388 A.2d 709, 720 (1978)] ("[T]he doctrine of *stare decisis* is not a vehicle for perpetuating error, but rather a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish.").

*Stilp v. Commonwealth,* 588 Pa. 539, 905 A.2d 918, 966–67 (2006) (citation and internal quotation marks omitted). For *stare decisis* to apply, a judicial decision must establish binding precedent. "The doctrine only applies to issues actually raised, argued and adjudicated, and only where the decision was necessary to the determination of the case. The doctrine is limited to actual determinations in respect to litigated and necessarily decided questions, and is not applicable to *dicta* or *obiter dicta.*" *Commonwealth v. Perry,* 568 Pa. 499, 798 A.2d 697, 707 (2002) (Castille, J., joined by Newman, J., concurring) (internal quotation marks omitted) (citing BLACK'S LAW DICTIONARY 1406 (6th ed. 1990)). The precedential decisions of this Court are binding throughout Pennsylvania, including upon this Court, and the precedential decisions of the lower courts bind those courts as well. *See Pries v. Workers' Comp. Appeal Bd. (Verizon Pa.),* 903 A.2d 136, 144 (Pa.Cmwlth.2006) ("Under *stare decisis,* we are bound to follow the decisions of our Court unless overruled by the Supreme Court or where other compelling reasons can be demonstrated."); *see also State Farm Mut. Auto. Ins. Co. v. Dep't of Ins.,* 720 A.2d 1071, 1073 (Pa.Cmwlth.1998). Thus, there is an imperative of institutional consistency and stability, both vertically and horizontally.

The law of the case doctrine refers to:

a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the

matter. Among the related but distinct rules which make up the law of the case doctrine are that: (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of coordinate jurisdiction, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

The various rules which make up the law of the case doctrine serve not only to promote the goal of judicial economy ... but also operate (1) to protect. the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end.

*Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326, 1331 (1995) (citations omitted). This doctrine, no less than *stare decisis,* promotes certainty and stability, but with particular emphasis on the various phases of individual cases.

The coordinate jurisdiction rule likewise addresses individual cases as it provides that "judges of coordinate jurisdiction sitting in the same case should not overrule each others' decisions." *Starr,* 664 A.2d at 1331. In *Starr,* this Court recognized that the coordinate jurisdiction rule is less an independent legal construct but rather is a member of the law of the case doctrinal family. *Id.* at 1331–32. In effect, "these rules seek to ensure fundamental fairness in the justice system by preventing a party aggrieved by one judge's interlocutory order to attack that decision by seeking and securing relief from a different judge of the same court." *Id.* at 1332. Departure from either the law of the case doctrine or the coordinate jurisdiction rule "is allowed only in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts

or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed." *Id.*

The Commonwealth Court's prior dispositions in *Empire* and *Factory Mutual* were both unpublished, single-judge orders by then-President Judge James Gardner Colins. Section 414 of the Commonwealth Court's Internal Operating Procedures ("IOPs") provides that a "single-judge opinion, even if reported, shall be cited only for its persuasive value, not as binding precedent." *See* 210 Pa.Code § 67.55; *see also Otter v. Cortes*, 969 A.2d 1276, 1284 n. 10 (Pa.Cmwlth.), aff'd per curiam, 600 Pa. 634, 969 A.2d 1180 (2009) (opinion to follow); *Snyder County Prison Bd. v. Pa. Labor Relations Bd.*, 912 A.2d 356, 362 n. 8 (Pa.Cmwlth.2006). This general rule serves its own important values, deriving from the complicated, hybrid nature of our Commonwealth Court, which sits sometimes as a single-jurist court of original jurisdiction, sometimes in single-judge review of administrative decisions, and sometimes in a strictly appellate review capacity, where panels of judges render binding appellate decisions.

The Judicial Code vests the Commonwealth Court with original jurisdiction where such jurisdiction is conferred by statute. 42 Pa.C.S. § 761(a)(4). This jurisdiction includes insurance company insolvencies where the insurance company is a domestic company licensed in the Commonwealth of Pennsylvania, as is the case here. 40 P.S. § 221.4(d); *see also Koken v. Reliance Ins. Co.*, 586 Pa. 269, 893 A.2d 70, 75 n. 10 (2006). When the Commonwealth Court exercises single-judge original jurisdiction, Section 311 of the court's IOPs provides that, "[d]epending upon the nature of the matter, the president judge or the duty judge shall by order set the matter down for evidentiary hearing or formal trial, for argument before a single judge in cases in which a single judge may dispose of the matter. . . ." 210 Pa.Code § 67.42. A party or entity aggrieved by a single judge's order may seek reconsideration, by that judge, under Section 331 of the IOPs: "[w]hen a party files a petition for reconsideration of an order issued by a single judge, the executive administrator or the

prothonotary shall submit the petition, together with any answer, to the judge for action, in accordance with Pa.R.A.P. 123(e)." 210 Pa.Code § 67.47. It would appear that Rule 123(e), in turn, provides generally for consideration by the full Court of actions of a single judge: "The action of a single judge may be reviewed by the court...." Pa.R.A.P. 123(e). Thus, in *Great Valley School District v. Zoning Hearing Board of East Whiteland Township,* 863 A.2d 74, 80–81 (Pa. Cmwlth.2004), the Commonwealth Court instructed that to do so, a party should follow Pa.R.A.P. 2541–2547, the general rules governing applications for reargument. *See also Balfour Beatty Constr., Inc. v. Dep't of Transp.,* 783 A.2d 901, 906 (Pa.Cmwlth.2001).

Given the nature of single-judge decisions of the Commonwealth Court, it is readily apparent that *stare decisis* is not applicable; thus, in this matter, that doctrine did not command fidelity to the previously decided *Empire* and *Factory Mutual* matters. It is equally apparent that the law of the case doctrine does not apply, as this is not: a case returned to a trial court on remand, a second appeal, or a matter that has been transferred. The coordinate jurisdiction rule poses a slightly closer question. If this dispute were a subsequent portion of the "same case" as *Empire* and *Factory Mutual,* then the Commonwealth Court would be bound by the coordinate jurisdiction rule. But the hundreds of distinct insurer subrogation claims within the more than 150,000 claims comprising the entire Reliance liquidation process do not quite resemble component parts of the "same case" in the manner understood by the coordinate jurisdiction rule. Thus, the coordinate jurisdiction rule does not apply.

But this does not end the inquiry. The preclusion doctrines evolved in response to particular cases and specific problems. The concern forwarded here poses a new scenario, deriving largely from the unique nature of the Commonwealth Court. The question then is whether the principles animating the preclusion doctrines should apply, in some measure, in this distinct paradigm. In my view, although none of the three primary issue preclusion doctrines fits this situation precisely,

the policies they promote—certainty, stability, uniformity, consistency, protection of settled expectations—should be given effect. The Reliance liquidation is an extremely complex process in which many parts and layers operate. In light of the challenges inherent in such an undertaking, the Insurance Department Act ("Act") expresses in its "Construction and Purpose" section that "[t]he purpose of this article is the protection of the interests of insureds, creditors, and the public generally, with minimum interference with the normal prerogatives of the owners and managers of insurers, through ... (iii) **enhanced efficiency and economy of liquidation, through clarification and specification of the law, to minimize legal uncertainty and litigation....**" 40 P.S. § 221.1(c) (emphasis added). The Act provides a statutory scheme for liquidation set forth in Sections 221.19–221.52. From the outset, the Commonwealth Court recognized the *sui generis* nature of the difficult task the Reliance litigation posed. Thus, on September 9, 2002, then-President Judge Colins issued an Order outlining procedures, deadlines, requirements, responsibilities, and instructions specific to the Reliance liquidation. Both the legislative and the judicial response to the unique challenges of the Reliance liquidation have attempted to provide a uniform, consistent, and predictable paradigm, not unlike the Newtonian concept of the universe. A certain degree of regularity, consistency, and stability in terms of the treatment of similarly-situated claims and claimants is one of the primary goals.

The Commissioner's application for reconsideration sets forth in detail the internal inconsistency between the single-judge decision here and those in the previously decided *Empire* and *Factory Mutual* matters. One of the considerations governing whether to allow reargument is "[w]here the court has overlooked or misapprehended (as by misquotation of text or misstatement of result) a controlling or directly relevant authority." Pa.R.A.P. 2543 cmt. The circumstances here would seem to indicate an instance where the court (in the form of a single judge) overlooked "directly relevant" authority even though that authority is not strictly controlling.

The Commonwealth Court's allowance of patent inconsistency in single-judge decisions in the Reliance litigation may derail other critical liquidation activities. For example, as the Commissioner notes, an actuarial study that estimates the ultimate payout obligations to Reliance claimants in the most desirable "(b) priority" category already has been commissioned. The Commissioner uses this study's projections to determine the appropriate interim distributions to those claimants who are clearly eligible for "(b) priority" status. If individual judges of the Commonwealth Court are free to issue inconsistent rulings, even when confronted with the existence of prior indistinguishable cases, the study projections will need to be adjusted in order to include hundreds of potential subrogation claims. Nor, the Commissioner warns, does the current scheme have procedures in place to address the likely reaction of past subrogation claimants who accepted "(g) status" under the understanding that such was the settled rule.

A failure to appreciate this disruption, or to attempt to acknowledge the issue head-on and distinguish or criticize the prior decisions, in this context, is intolerable. Of course, single-judge decisions in the context of the Reliance litigation, like single-judge decisions in any matter, may be erroneous. But, if so, the corrective measure should be the usual ones available when a preclusion doctrine applies: prompt, open, and formal reconsideration before a Commonwealth Court panel. In addition, there is nothing to preclude a single judge from referring an issue to the Commonwealth Court as a whole. A single judge who is convinced that the prior decisions are problematic may explain the basis for that view and invite correction at a higher level. But single judges in the context of complex liquidation litigations like this one should be mindful of the stakes involved and should be discouraged from essentially ignoring prior cases that appear to be directly on-point. And the Commonwealth Court as a whole should take measures to ensure that the disruptions are minimal.

An additional reason supporting a directive that the Commonwealth Court pay more heed to ensuring consistency and regularity in its decisions in the Reliance liquidation derives

from this Court's supervisory authority. The fact that single-judge decisions are not precedential should not be taken as an invitation to a disruption to be passed onto this Court for forced review of an issue arising from demonstrable, doctrinal inconsistencies in single-judge decisions. In this case, the judge provided no explanation for the inconsistency his decision created. He did not suggest that the resolutions in *Empire* and *Factory Mutual* were distinguishable or in error when measured against precedent; the law has not changed; and no new evidence has come to light. The court as a whole did nothing to correct or explain the obvious inconsistency. The Commonwealth Court's obligation to rule consistently in similarly situated cases is an institutional imperative that must be taken seriously, both by single judges and by the Commonwealth Court as a whole.[3]

Justice SAYLOR, Concurring.

I differ with the majority's position that the language of Section 544 is clear and unambiguous. *See* Majority Opinion at 502–03, 980 A.2d at 595. Rather, I find that Northland advances a colorable argument that Farm Bureau's subrogation claim qualifies for subsection (b) priority under a literal reading of the statute, since Farm Bureau is a "claimant" standing in the shoes of a "third party" to a Reliance policy pursuing a "claim[ ] under [such] polic[y] for losses." 40 P.S.

3. I recognize that, under the Rules of Appellate Procedure and cases such as *Great Valley*, *supra*, the Commissioner could have taken measures short of petitioning for review by this Court to ensure the consistency he desires, *i.e.*, by seeking formal reargument before the Commonwealth Court as a whole under Pa.R.A.P. 2541–2547. As I understand it, however, in practice, the court as a whole has an opportunity to consider the reconsideration application made to the single judge, although that practice is not generally acknowledged in the IOPs or the Rules of Appellate Procedure. That informal practice may explain why eleven copies of an application for reconsideration to the Commonwealth Court are required pursuant to Pa.R.A.P. 2541 even though the court's IOPs say that the application is exited only to the single judge. Institutional litigants such as the Commissioner may be aware that a single-judge denial has at least some measure of approval by the Commonwealth Court as a whole. Whether my understanding is accurate or not, the Commonwealth Court should have some formal mechanism in place to better police these matters.

§ 221.44(b).[1] Since, however, a subrogation interest deriving from a potential third-party claimant is even further removed from the policy than the underlying third-party claim itself, a question arises whether the Legislature intended for such claims to enjoy subsection (b) priority. The National Association of Insurance Commissioners, drafter of the model legislation on which the Section 544 priority scheme is based, provides an extensive discussion of the history and intent of the statute, which I believe addresses the material ambiguity deriving from the indirectness of the subrogee's connection to the policy of the insolvent insurer.

Principally, based on the drafting history and associated policies, I believe the NAIC persuasively demonstrates that subrogation claims were not considered the type of "loss claim" that subsection (b) priority is designed to address. *See* NAIC Brief at 7–11. Indeed, the NAIC observes that changes were made in 1994 which "merely make[ ] clear what was intended all along: that claims of subrogated insurers are not included in the same priority as those of [direct] third-party claimants and policyholders." *Id.* at 11.

Chief Justice CASTILLE joins this concurring opinion.

1. In this regard, I do not read Northland's argument as placing it in a "double bind." Majority Opinion, at 504–05, 980 A.2d at 595–96. Indeed, one of the linchpins to this conclusion, namely, the majority's position that Farm Bureau is not the claimant, *see id.* at 504–05, 980 A.2d at 595–96, seems to me to be strained. I fail to see how Farm Bureau is any less a "claimant" for purposes of subsection (b) than it is under subsection (g). Finally, in reasoning that Farm Bureau cannot be accorded subsection (b) priority because this would invest it with rights greater than the subrogor, *see id.* at 504–05, 980 A.2d at 596, the majority overlooks Northland's argument that "[i]t is black-letter law that a party in subrogation steps into the shoes of the subrogor and

assumes its rights as they existed *before*—not after—indemnification occurred." Northland Brief at 13–15.